JAIME TORRES MALDONADO, demandante y recurrente, *v.* J.C. PENNEY COMPANY, demandada y recurrida.

*Número:* RE-87-230          *Resuelto:* 3 de junio de 1992

---

548

*Julio E. Gil de Lamadrid y Raúl Barreras Morales*, abogados del recurrente; *David Rivé Rivera*, abogado de la recurrida.

La Juez Asociada Señora Naveira de Rodón emitió la opinión del Tribunal.

# I

El Sr. Jaime Torres Maldonado tenía una cuenta rotativa con J.C. Penney (en adelante Penney). El 11 de julio de 1981 compró en Penney un televisor a color de diecinueve pulgadas (19") valorado en cuatrocientos cuarenta y ocho dólares ($448). Pagó en efectivo la cantidad de cien dólares ($100) y cargó el resto a su tarjeta de crédito.

El televisor adquirido por el señor Torres Maldonado se dañó en varias ocasiones, aparentemente como resultado de un defecto de fábrica. A pesar de que Penney intentó arreglarlo en repetidas ocasiones, lo cierto es que el señor Torres Maldonado no quedó satisfecho con las reparaciones y decidió devolver el televisor a la tienda. Reclamó a Penney un crédito por el televisor devuelto.

Ante la negativa de Penney de reconocerle el crédito por la devolución del televisor, el señor Torres Maldonado instó querella en el Departamento de Asuntos del Consumidor (D.A.Co.). La agencia le ordenó a la tienda que le reconociera el crédito al señor Torres Maldonado por la cantidad de cuatrocientos cuarenta y ocho dólares ($448), precio de venta del televisor.[1]

Posteriormente, el 14 de diciembre de 1983 la agencia de cobro Collection & Manpower Assistance, Inc. notificó mediante carta al señor Torres Maldonado que la cuenta rotativa que él tenía con Penney reflejaba un balance vencido de ochenta y cinco dólares con veintitrés centavos ($85.23). Se le apercibió que de no remitir el pago dentro de los próximos diez (10) días de la fecha de la carta que le fuera enviada, se procedería al cobro de la deuda por la vía judicial.

Así las cosas, Penney instó demanda en cobro de dinero

---

[1] En el Informe de Investigación rendido por el investigador del Departamento de Asuntos del Consumidor (D.A.Co.) se indica que el 20 de mayo de 1982, se personó por segunda vez a la tienda querellada J.C. Penney (en adelante Penney) y allí se le informó que le habían dado el crédito al Sr. Jaime Torres Maldonado.

en el Tribunal de Distrito de Bayamón en contra del señor Torres Maldonado el 4 de enero de 1984. Desistió con perjuicio de dicha acción el 27 de marzo de 1984, alegando que la cuantía envuelta no justificaba la acción, ya que el costo del litigio sería mayor. No obstante, Penney notificó al United Credit Bureau (U.C.B.) sobre la alegada deuda del señor Torres Maldonado. El U.C.B. procedió a redactar un informe de crédito en el que hizo constar lo informado.

Mientras todo esto estaba ocurriendo, el señor Torres Maldonado solicitó un préstamo a la financiera Motoros Bankers, Inc. para adquirir un negocio, el Restaurante Valencia de Bayamón.(²) El préstamo le fue denegado debido a los "atrasos de las obligaciones de crédito."(³) En el Informe sobre Denegación de Crédito, Terminación o Cambio se le indicó que la información fue obtenida de un "reporte de una agencia de información de crédito".

Por tal razón, el 20 de agosto de 1984 el señor Torres Maldonado instó demanda civil en daños y perjuicios en contra de Penney. Alegó que por culpa y/o negligencia de Penney, ésta refirió su nombre y cuenta al U.C.B., "como persona delincuente", difamando así su buen nombre y perjudicando su crédito. Alegó, además, que a raíz de dicho "informe de delincuencia" le fue denegado el préstamo que solicitó a la financiera, lo que ocasionó que él tuviera que entregar el negocio del restaurante al no poder cumplir con el pago adeudado al vendedor. Reclamó por concepto de

---

(²) De acuerdo con lo alegado por el señor Torres Maldonado, éste compró el Restaurante Valencia de Bayamón por la cantidad de nueve mil dólares ($9,000). Abonó tres mil dólares ($3,000), y quedó a deber seis mil dólares ($6,000), pagaderos en o antes del 26 de abril de 1984.

(³) Posteriormente, solicitó un nuevo préstamo al Chase Manhattan Bank, N.A., el cual también le fue denegado el 24 de agosto de 1984. En la notificación de la denegatoria del préstamo se le informó al señor Torres Maldonado que la decisión del Banco se basó en la información que le suministró el United Credit Bureau de Puerto Rico.

daños y perjuicios la cantidad de doscientos mil dólares ($200,000).([4])

El 20 de febrero de 1986, luego de la celebración de la vista en su fondo, Penney presentó una moción de desestimación. En el memorando en apoyo de dicha moción argumentó que "los elementos para imponerle responsabilidad a la demandada en una situación como la que se presenta en este caso, están delimitados por el 'Fair Credit Reporting Act'" (en adelante F.C.R.A.), 15 U.S.C. sec. 1601 y ss. Sostuvo que la ley F.C.R.A., 15 U.S.C. sec. 1681h(e), "establece que ninguna persona natural puede iniciar una acción por difamación, negligencia o invasión a la privacidad contra una agencia de informes de crédito (como el 'United Credit Bureau' en este caso) ni contra la persona que suple la información a dicha agencia de crédito (como J. C. Penney en este caso), a menos que la información suplida sea falsa, y se haya diseminado con malicia, o intención deliberada de perjudicar al demandante". Alegó, además, que estos criterios de responsabilidad ocupan el campo y prevalecen sobre cualquier ley estatal. Concluyó, por lo tanto, que no procedía una acción al amparo del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141.

El tribunal de instancia desestimó la demanda en contra de Penney el 31 de marzo de 1987. Basó su determinación en que el demandante "no presentó pruebas admisibles para establecer el hecho en que descansa este pleito, a saber: que las financieras que le rechazaron su crédito lo hicieron debido a referencias negativas de crédito emanadas de J. C. Penney Company.([5]) Tampoco se estableció,

---

([4]) Reclamó, además, nueve mil dólares ($9,000), por el precio del negocio, diez mil dólares ($10,000), que invirtió en mercancía y equipo para el negocio, costas, intereses legales y veinte mil dólares ($20,000) en honorarios de abogado.

([5]) La Sra. María Teresa Rodríguez, Gerente de Cobros de Penney, en carta de 27 de abril de 1984, le comunicó al señor Torres Maldonado lo siguiente:

"Según fue requerido por usted, nos comunicamos con la señora Margarita Viera, del United Credit Bureau de Puerto Rico, *solicitando el por qué no se había sacado la referencia de la cuenta indicada de su informe de crédito, enviada por J. C.*

mediante prueba admisible, en qué consistían las referencias de crédito de J. C. Penney Company en cuanto al demandante Jaime Torres Maldonado, ni tampoco se estableció que dichas referencias hubiesen sido falsas o equivocadas". Concluyó, como cuestión de derecho, que "aún cuando la parte demandante hubiese establecido que la información suplida por la demandada United Credit Bureau era falsa (hecho éste que no fue establecido) tenía que establecer que se hizo con malicia o intención deliberada de perjudicar al demandante".

Inconforme con esta determinación, la parte demandante recurrente presentó un escrito de revisión ante nos planteando dos (2) señalamientos de error:

1. Que Penney incurrió en culpa y/o negligencia a tenor con el Art. 1802 del Código Civil, *supra.*

2. Que los daños sufridos por el demandante recurrente son consecuencia directa de la culpa y/o negligencia de la recurrida Penney.

Decidimos revisar y expedimos el auto solicitado.

## II ·

■■■■ La ley federal conocida como F.C.R.A. se aprobó con el fin de regular la actividad de dos partes: las agencias de información de crédito y los usuarios de informes del consumidor. A tales efectos, la ley define lo que es una agencia de información de crédito del consumidor de la manera siguiente:

> (f) The term "consumer reporting agency" means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of

---

*Penney desde el pasado 16 de marzo.*
"La señora Viera, prometió corregir su récord en el día de hoy, ya que indica no haber recibido tal reclamación." (Énfasis suplido.)
*El 31 de octubre de 1984 se eliminó por el U.C.B. la referencia negativa que constaba en el expediente del señor Torres Maldonado.*

assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports. 15 U.S.C. sec. 1681a(f).

Por otra parte, se ha dicho que los usuarios de informes del consumidor son generalmente las aseguradoras, los acreedores y los patronos, quienes compran la información del consumidor para utilizarla con relación a la transacción objeto del informe. Basados en este informe deciden si conceden crédito, le expiden un seguro o le dan el empleo a la parte solicitante. Véase Comentarios, *Houghton v. New Jersey Manufacturers Insurance Co.: A Narrow Interpretation of the Scope Provisions of the Fair Credit Reporting Act Threatens Consumer Protection*, 71 Minn. L. Rev. 1319, 1322, 1326 y 1329 (1987). De hecho, el Congreso de Estados Unidos reconoció que los usuarios de información del consumidor deben tener disponible información adecuada para poder evaluar los riesgos que conlleva una transacción del consumidor. S. Rep. No. 517, 91st Cong., 1st Sess. 2 (1969). Todo ello con miras a fortalecer el comercio y no imponerle trabas al mismo. Sin embargo, se trató de establecer un balance adecuado, de manera que al fortalecer el comercio no se dejara desprovisto al consumidor de protección frente a las agencias de información del consumidor. Y es que la amenaza de informes erróneos es significativa, ya que esta industria de informes del consumidor expide más de cien millones de estos informes anualmente. Aproximadamente cinco millones de consumidores son víctimas de informes erróneos cada año. Comentarios, *supra*, pág. 1322.

Teniendo en mente lo anterior, la ley F.C.R.A. define el informe del consumidor de la manera siguiente:

(d) The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit

standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (1) credit or insurance to be used primarily for personal, family, or household purposes, or (2) employment purposes, or (3) other purposes authorized under section 1681b of this title. *The term does not include (A) any report containing information solely as to transactions or experiences between the consumer and the person making the report*; (B) any authorization or approval of a specific extension of credit directly or indirectly by the issuer of a credit card or similar device; or (C) any report in which a person who has been requested by a third party to make a specific extension of credit directly or indirectly to a consumer conveys his decision with respect to such request, if the third party advises the consumer of the name and address of the person to whom the request was made and such person makes the disclosures to the consumer required under section 1681m of this title. (Énfasis suplido.) 15 U.S.C. sec. 1681a(d).

■ De la definición anterior claramente se desprende que se exceptúa como informe del consumidor aquella información basada solamente en las transacciones o experiencias entre el consumidor y la persona que suple la información. Amparados en esta excepción, los tribunales estatales y federales han sostenido que tanto las tiendas por departamento como los bancos, los cuales suplen información al U.C.B. basados en sus récord de crédito con respecto a un cliente suyo, no se convierten en una agencia de información de crédito ni en un usuario de información del consumidor. Mucho menos la información suplida viene a ser un informe del consumidor. Así, en *Rush v. Macy's New York, Inc.*, 775 F.2d 1554, 1557 (11mo Cir. 1985), se dijo analizando la ley F.C.R.A., 15 U.S.C. sec. 1681a(d), lo siguiente:

This section further provides that the term "consumer report" does *not* include "any report containing information solely as to transactions or experiences between the consumer and the person making the report". The information that Macy's provided to CBI was such a report, based solely on its own

credit records of store transaction; thus, it cannot constitute a "consumer report" under the FCRA. (Énfasis en el original y cita omitida.)

En *Álvarez Meléndez v. Citibank*, 705 F. Supp. 67, 70 (D. P.R. 1988), se mantuvo lo expresado anteriormente al sostenerse que:

Parties who do no more than furnish information to a credit reporting agency are therefore not covered by the Act.[6]

Ahora bien, la parte demandada recurrida sostiene que la ley federal, 15 U.S.C. sec. 1681h(e), tiene el efecto de ampliar la cobertura de la misma, extendiendo su protección a toda persona que provea información a una agencia de información de crédito. No le asiste la razón.

■ La ley federal dispone lo siguiente:

Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, *or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title,* except as to false information furnished with malice or willfull intent to injure such consumer. (Énfasis suplido.) 15 U.S.C. sec. 1681h(e).

■ Esta sección, no cabe duda, concede una inmunidad cualificada a las agencias de información de crédito y a los usuarios de información del consumidor. Solamente se puede instar una acción en su contra si se les prueba malicia. En otras palabras, la mera negligencia no da base para una acción judicial.

Ahora bien, ¿se extiende esta inmunidad cualificada a toda persona que provea información a una agencia de in-

---

[6] Véanse, además: *Rush v. Macy's New York, Inc.*, 596 F. Supp. 1540 (S.D. Fla. 1984); *Mitchell v. First Nat. Bank of Dozier*, 505 F. Supp. 176 (M.D. Ala. 1981).

formación de crédito? La jurisprudencia ha sostenido lo contrario. De hecho, se afirma que el F.C.R.A., 15 U.S.C. sec. 1681h(e), no crea una causa de acción federal separada o independiente de la estatuida en la ley. *Álvarez Meléndez v. Citibank*, supra.

Por otra parte, dicha sec. 1681h(e) tiene que leerse en el contexto de la disposición jurisdiccional, la que autoriza a los tribunales a hacer cumplir las obligaciones impuestas por la ley (15 U.S.C. sec. 1681p), y las secciones que limitan la responsabilidad civil de las agencias de información de crédito y los usuarios de información del consumidor a actuaciones intencionales maliciosas (15 U.S.C. secs. 1681n y 1681o).(⁷) Por tal razón, en *Álvarez Meléndez v. Citibank*, supra, se expresó que:

> Moreover, the very title of section 1681h(e) "Limitation of liability" —suggests that the subsection was not intended to create a separate federal cause of action. Thus, the FCRA itself imposes no affirmative duties on sources such as the defendant bank if the information provided is not a consumer report. Parties who do no more than furnish information to a credit reporting agency are therefore not covered by the Act.
>
> Rather, it appears that Congress intended section 1681h(e) to provide immunity from common law actions based on information provided pursuant to the provisions of the Act. Qualified immunity for sources, reporting agencies and users of information is the *"quid pro quo* for full disclosure". (Énfasis en el original y cita omitida.)

De manera que debemos concluir que la ley federal F.C.R.A. sólo aplica a las agencias de información de crédito y a los usuarios de información del

---

(⁷) En H.C. Black, *Black's Law Dictionary*, 5ta ed., Minnesota, Ed. West Publishing Co., 1979, pág. 1434, se define *willful intent* de la manera siguiente:

"A willful act may be described as one done intentionally, knowingly, and purposely, without justifiable excuse, as distinguished from an act done carelessly, thoughtlessly, heedlessly, or inadvertently. A willful act differs essentially from a negligent act ....

"Premeditated; malicious; done with evil intent, or with a bad motive or purpose, or with indifference to the natural consequences; unlawful; without legal justification."

consumidor.[8] Por lo tanto, la actuación de una tienda por departamento de proveer información a una agencia de información de crédito basada en sus récord de crédito con respecto a un cliente suyo no está cobijada por la ley federal F.C.R.A. Y si no está enmarcada dicha acción dentro del ámbito federal, no podemos entonces decir, en el presente caso, que la ley federal F.C.R.A. ocupa el campo. Pero si la actuación de la tienda estuviera cobijada por la ley federal, como podría estarlo en otras situaciones, ésta tampoco ocupa el campo. Así lo establece esta ley, la cual dispone lo siguiente:

> This subchapter does not annul, alter, affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to the collection, distribution, or use of any information on consumers, except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency. 15 U.S.C. sec. 1681t.

Nos resta entonces determinar si procede una acción bajo el Art. 1802 del Código Civil, *supra*, y si es necesario que la parte demandante alegue y pruebe la malicia de la parte demandada.

---

[8] En *Mitchell v. First Nat. Bank of Dozier*, supra, pág. 178, se sostuvo que:

"First, the very title of section 1681h(e) —'Limitation of liability'— indicates that this subsection was not intended to create a separate federal cause of action. More importantly, the language of the provision when read carefully points to the same conclusion. In subsection h(e) of section 1681, Congress intended only to limit state common law actions which might be brought by consumers on the basis of information obtained under certain reporting requirements of the FCRA. By subsection h(e), Congress chose to limit those state causes of action, 'in the nature of defamation, invasion of privacy, or negligence,' based on information 'disclosed pursuant to section 1681g, 1681h, or 1681m' of the FCRA to cases where false information is 'furnished with malice or willful intent to injure' the consumer.

"In short, Congress intended that the section invoked by plaintiff be used as a shield against actions at common law, when the information giving rise to the cause of action is obtained by the complainant pursuant to the provisions of the Act. Congress created an exception to this shield when information is 'furnished with malice or willful intent to injure,' but no basis exists for altering the shield of section 1681h(e) into the sword now sought by the plaintiff. Section 1681h(e) addresses itself only to the availability of state causes of action when the basis of those suits rests on information disclosed pursuant to the Act."

## III

██ Habiéndose determinado que no aplica la ley federal F.C.R.A. al presente caso, el remedio que provee nuestro ordenamiento jurídico para en caso en que una parte sufre daño a consecuencia de la acción negligente de otra es el Art. 1802 del Código Civil, *supra*.[9]

██ De entrada, vale señalar que no procede imponer el deber de probar malicia en una acción al amparo del Art. 1802, *supra*. Basta probar la existencia de relación causal entre el daño y la acción u omisión negligente que lo produjo. En otras palabras, hay que demostrar en primer término que la parte demandante sufrió un daño. En segundo lugar, que la parte demandada actuó negligentemente. Por último, y el más importante, que el daño sufrido fue con toda probabilidad el resultado de la acción u omisión negligente del demandado. A tales efectos, hemos sostenido que la relación causal en nuestra jurisdicción se rige por la teoría de la causalidad adecuada. *Cárdenas Maxán v. Rodríguez Rodríguez*, 125 D.P.R. 702 (1990); *Jiménez v. Pelegrina Espinet*, 112 D.P.R. 700 (1982); *Soc. de Gananciales v. Jerónimo Corp.*, 113 D.P.R. 127 (1974). De acuerdo con esta teoría, "no es 'causa' toda condición sin la cual no se hubiera producido el resultado, sino aquella que ordinariamente lo produce, según la experiencia general". *Cárdenas Maxán v. Rodríguez Rodríguez*, supra, pág. 710. Lo determinante es si era de esperarse la ocurrencia del daño. Apliquemos lo anterior al caso de autos.

El señor Torres Maldonado compró un televisor a Penney, el cual tuvo que llevar a reparar en varias ocasiones.

---

[9] El Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, dispone que:

"El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización."

Ante la imposibilidad de Penney de reparar satisfactoriamente el televisor, éste decidió devolverlo a la tienda. Reclamó un crédito por la devolución del televisor, a lo que Penney se negó. Posteriormente, Penney instó demanda en cobro de dinero contra el señor Torres Maldonado por la cantidad de ochenta y cinco dólares con veintitrés centavos ($85.23). Finalmente, desistió con perjuicio de dicha acción.

Por su parte, el señor Torres Maldonado acudió a D.A.Co. para exigirle a Penney que le reconociera el crédito por el televisor devuelto. La agencia así se lo ordenó, mas sin embargo, Penney ya había informado al U.C.B. de los supuestos atrasos del señor Torres Maldonado en su cuenta rotativa con la tienda.

Mientras todo esto ocurría, el señor Torres Maldonado gestionó en dos (2) ocasiones un préstamo, uno con una financiera y otro con el Chase Manhattan Bank, N.A. Ambos préstamos le fueron denegados por la información que suministró el U.C.B., a los efectos de que tenía atrasos en las obligaciones de crédito. Por tal razón, el señor Torres Maldonado demandó a Penney en daños y perjuicios.

No hay lugar a dudas de que el señor Torres Maldonado sufrió daño como consecuencia de la información errónea suministrada al U.C.B. sobre su capacidad de pago, lo cual afectó su crédito ocasionando que se le denegara en dos (2) ocasiones un préstamo. Ahora bien, ¿se le puede atribuir a Penney el haber suplido esta información al U.C.B., estableciendo así el nexo causal entre la negligencia y el daño sufrido por el señor Torres Maldonado? Entendemos que sí; veamos.

En el expediente hay suficiente prueba circunstancial que demuestra que Penney actuó negligentemente en este caso, provocando dicha negligencia el resultado ya conocido. Recordemos que "la evidencia circunstancial es intrínsecamente igual que la evidencia directa". *Zambrana*

*v. Hospital Santo Asilo de Damas,* 109 D.P.R. 517, 525 (1980).

Analicemos la evidencia según ésta surge de los autos. Primeramente, Penney no reconoció en un principio el crédito al señor Torres Maldonado por el televisor entregado, por lo que refirió su cuenta con los supuestos atrasos a una agencia de cobro. Esta le envía una carta al señor Torres Maldonado reclamándole el pago de lo supuestamente adeudado. En vista de que el señor Torres Maldonado no pagaba, se le demandó en cobro de dinero, acción de la cual posteriormente se desistió con perjuicio. Todo esto debemos analizarlo conjuntamente con la carta que envió la Gerente de Cobros de Penney al U.C.B. para solicitar que se le eliminara del expediente del señor Torres Maldonado el informe negativo. No cabe duda que de todos estos hechos se puede deducir que Penney actuó negligentemente al referir al U.C.B. información errónea sobre la cuenta rotativa de éste a los efectos de que estaba atrasado en los pagos.

Por otra parte, cabe señalar que Penney no pudo demostrar que el señor Torres Maldonado hiciera otras compras en la tienda con su tarjeta de crédito, lo que apoya la conclusión de que la compra y devolución del televisor fue lo que generó la cadena de eventos que culminó en la denegatoria del préstamo. Tampoco Penney pudo demostrar que el señor Torres Maldonado tuviera préstamo alguno y fuera moroso en el pago del mismo. A su vez, no pudo demostrar que éste hiciera compras en otras tiendas por departamento.

Resta entonces hacer la valoración del daño sufrido tomando en consideración que en materia de daños no basta con alegar el daño sufrido, sino que también hay que probarlo. No obstante, tal determinación no puede hacerse por este Tribunal, puesto que el tribunal de instancia acogió la moción de desestimación de la parte demandada, no entrando así a considerar los daños.

En virtud de lo anterior, *se dictará sentencia revocando la emitida por el Tribunal Superior, Sala de San Juan, el 31 de marzo de 1987, y se devuelve el caso a instancia para que continúen los procedimientos en forma compatible con todo lo expresado en la opinión y no para que exclusivamente se determinen los daños. Esto incluye, claro está, determinar la relación causal entre el acto negligente y los daños.*

El Juez Asociado Señor Hernández Denton concurrió sin opinión escrita.