José Rodríguez Roldán, demandante y recurrido, *v.* Municipio de Caguas, Autoridad de Energía Eléctrica, Departamento de Recursos Naturales y/o Estado Libre Asociado de Puerto Rico, y las Compañías Aseguradoras A, B y C, demandados y recurrente el primero.

*Números:* RE-89-601　　　*Resueltos:* 23 de junio de 1993
　　　　　RE-89-602

*Gonzalo J. Barreras Varona*, abogado de los recurrentes; *Manuel García Tamayo*, abogado del recurrido.

## SENTENCIA

El 9 de octubre de 1986 el demandante, José Rodríguez Roldán, de cuarenta (40) años de edad, a eso de las dos (2) de la madrugada, sufrió un accidente mientras transitaba por la calle Windsor de la primera sección de la urbanización Villa del Rey, bajo la jurisdicción del Municipio de Caguas (en adelante el Municipio). Hacia esa fecha, esta vía de rodaje corría de forma recta y terminaba abruptamente en el vacío, en un corte vertical de unos catorce (14) pies de altura, desde el tramo mencionado de carretera hasta una quebrada al fondo. En el tramo referido de carretera no había ningún aviso ni rotulación que señalara su abrupto fin, como tampoco había vallas ni ninguna otra medida de seguridad que indicara el final de la carretera e impidieran que los vehículos continuaran la marcha hacia el vacío. Para la fecha del accidente del demandante, los focos de alumbrado de la Autoridad de Energía Eléctrica (en adelante A.E.E.) hacia el final de la calle estaban fundidos, y así habían estado por lo menos durante los últimos tres (3) meses. T.E., págs. 26 y 84–85. Tales condiciones habían sido reportadas en ocasiones innumerables tanto al perso-

nal del Municipio como mediante llamadas telefónicas a la
A.E.E. Antes del accidente se había reportado otro anterior, sin que se hubiesen corregido las condiciones peligrosas del área.(¹)

El accidente ocurrió cuando el demandante —al no poder percibir la intersección en la cual debía hacer un viraje— prosiguió su marcha cayendo al vacío. La ausencia de medidas de seguridad y la peligrosidad de las condiciones existentes impidieron al demandante detectar el precipicio, puesto que la vía se encontraba mojada y al otro lado de la quebrada había un foco de una finca privada, el cual creaba la impresión de continuidad en la vía de rodaje.(²) El demandante trancurría a razón de quince (15) a veinte (20) millas por hora según surge de su testimonio y del testimonio del perito, ingeniero especialista en reconstrucción de accidentes, Sr. David E. Cintrón.(³) No surge de la prueba que estuviese conduciendo bajo los efectos de bebidas embriagantes.(⁴) Además, transitaba con sus luces encendidas.(⁵)

Al caer al vacío, el automóvil rodó parcialmente e impactó el fondo de la quebrada con su parte frontal izquierda, volcándose para descansar, así, finalmente sobre

---

(¹) Así surge de los testimonios de Felícita Amparo (T.E., págs. 26–27 y 31–33), Matilde Claudio (íd., pág. 69) y Carmen Ana Torres (íd., págs. 84–85), todas vecinas de la calle Windsor. Además, se sometió el testimonio del Sr. Rafael Aponte como prueba acumulativa. En contestación a interrogatorio, la Autoridad de Energía Eléctrica (en adelante A.E.E.) admitió que era su responsabilidad reparar los focos si eran reportados. Ésta fue debidamente introducida en evidencia. Íd., págs. 10–11.

(²) Véase T.E., págs. 28–29, 55 y 79.

(³) Véase T.E., págs. 135, 189 y 205–206.

(⁴) De sólo uno (1) de los tres (3) informes sobre la condición del demandante realizados en el Hospital Municipal surge la anotación de *etoh breath* (olor a alcohol). Los demandados no introdujeron debidamente el documento en evidencia. Por otro lado, surge del testimonio de los vecinos que luego del accidente el demandante no expelía olor a alcohol alguno. Por su parte, el demandante atestó, y así lo creyó el juez de instancia, que el posible olor a alcohol que pudiera notar la persona que hizo la anotación (la cual no fue traída a testificar por los demandados) debió ser el del alcohol que utilizaron para limpiarle las heridas en el rostro y la frente. Véase T.E., págs. 39–40, 51, 70 y 90.

(⁵) Véase T.E., pág. 50.

la capota. Como consecuencia del impacto, la parte frontal izquierda de la capota se hundió. El demandante sufrió un golpe en el lado derecho de su frente cuando chocó con el espejo retrovisor.[6] Luego se soltó el cinturón de seguridad y cayó sobre la capota, recibiendo varios golpes. Finalmente, logró pasar a la parte trasera del vehículo por el temor de que pudiera incendiarse y estuvo allí atrapado hasta que varias personas rompieron un cristal y lo sacaron.

Como producto del accidente, el demandante sufrió varias lesiones físicas, incluyendo una miositis cervical paravertebral, la cual le creaba fuertes dolores de cuello y cabeza que lo incapacitaban parcialmente para trabajar y afrontar situaciones de tensión (*stress*), y la cual según dictaminó el fisiatra asesor de la Administración de Compensación por Accidentes de Automóviles (en adelante A.C.A.A.), doctor Sáez, no mejoraría con el tratamiento; teniendo el demandante que "aprender a vivir con más dolor". T.E., págs. 167–168. Además, sufrió una lesión cerebral irreversible, la cual lo incapacitó para desempeñarse en su profesión de abogado, según atestado por el perito en neuropsicología, Dr. Jorge A. Montijo, y por el neurólogo, Dr. Antonio Llona. Íd., págs. 278–281 y 322–323. El demandante presentó una demanda contra la A.E.E. y el Municipio, entre otros, para solicitar el resarcimiento de los daños, las angustias mentales y morales sufridas, y otras pérdidas y daños de naturaleza económica.

La vista del caso en su fondo fue celebrada el 8 y 9 de mayo de 1989. La parte demandante presentó siete (7) estipulaciones a las cuales se había llegado en la Conferencia

---

[6] Durante el contrainterrogatorio del ingeniero Cintrón, los demandados cuestionaron la posibilidad de que el demandante si se encontraba usando los cinturones hubiese chocado con el espejo. El testigo explicó tal posibilidad y señaló que debido a la forma en que ocurrió el accidente, al caer el automóvil al vacío, la parte del cinturón que actúa sobre el torso no se activó, pues ésta se activa (tranca) con la fricción del frenaje. Véase T.E., págs. 190–197.

con Antelación al Juicio; catorce (14) preguntas y sus contestaciones de un interrogatorio dirigido al Municipio; una (1) pregunta y una (1) contestación de un interrogatorio dirigido a la A.E.E.; su propio testimonio y el de cuatro (4) vecinos inmediatos al lugar del accidente; el testimonio de dos (2) oficiales del Banco Popular y la Pan American Insurance Company, respectivamente; el testimonio pericial de un ingeniero, especialista en el análisis y evaluación de accidentes automovilísticos (conocido como la reconstrucción de accidentes automovilísticos), y los testimonios de un fisiatra, un psiquiatra y un psicólogo clínico especialista en neuropsicología.

La parte demandante presentó además, como prueba documental y material, sus récord médicos con la A.C.A.A., el Hospital Regional de Caguas y varios médicos; planillas de contribución sobre ingresos; un plano a escala del lugar del accidente, y un conjunto de fotos del vehículo y del lugar del accidente.

*La participación en la vista de las codemandadas se limitó a contrainterrogar a los testigos de la parte demandante y a solicitar que se tomara conocimiento judicial del Caso Núm. CS-82-1871.*[7] *No prestaron prueba testifical, pericial o material alguna para sustentar sus posiciones.* La codemandada, A.E.E., no presentó prueba para sustentar la demanda contra coparte.

Luego de haber ponderado la prueba presentada, y al no haber aportado ninguna prueba los demandados más allá del contrainterrogatorio poco efectivo al que sometieron a los testigos del demandante, el tribunal *a quo* dictó sentencia a favor del demandante. Condenó a los demandados a pagar la suma total de quinientos ochenta y nueve mil setecientos setenta dólares con veintiséis centavos

---

[7] Se trató de otro severo accidente de tránsito sufrido por el demandante en 1981.

($589,770.26).[8] De esta sentencia recurren ante nos el Municipio y la A.E.E.

En síntesis, cuestionan la apreciación de la prueba que hiciera el tribunal de instancia en cuanto a la negligencia de los demandados al no estimar la negligencia comparada del demandante y al evaluar la cuantía de los daños compensables. Cuestionan, además, la imposición de honorarios e intereses por temeridad en su contra. Veamos.

## II

La procedencia de una acción en daños y perjuicios al amparo del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, depende de que el demandante establezca, por preponderancia de prueba, los elementos constitutivos de la causa de acción. A saber: la realidad del daño sufrido; la existencia de un nexo causal entre el daño y la acción u omisión de otra(s) persona(s), y que este acto u omisión fue culposo o negligente. *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990); *Reyes v. Scn. Sánchez Soto*, 98 D.P.R. 305 (1970); *Hernández v. Fournier*, 80 D.P.R. 93 (1957). El grado de cuidado que requiere el ordenamiento es el exigible a un hombre prudente y razonable ante las circunstancias del caso. *Ortiz v. Levitt & Sons*, 101 D.P.R. 290 (1973); *Hernández v. La Capital*, 81 D.P.R. 1031 (1960).

---

[8] Tal suma se desglosa en: treinta mil dólares ($30,000) por concepto del resarcimiento de los dolores y molestias físicas sufridos por el reclamante; cuarenta mil dólares ($40,000) por razón de la miositis cervical paravertebral permanente; ciento cincuenta mil dólares ($150,000) por los daños relacionados al daño cerebral permanente debido a la disminución de sus capacidades intelectuales y la capacidad de relacionarse; cien mil dólares ($100,000) por los daños y angustias mentales relacionados a este daño cerebral orgánico y de reconocerse incapaz para ejercer la profesión; cuarenta y dos mil ochocientos siete dólares con ochenta y dos centavos ($42,807.82) por concepto de ingresos dejados de percibir; doscientos veintidós mil cientocincuenta dólares con treinta y dos centavos ($222,150.32) en resarcimiento por su pérdida de la capacidad de producir ingresos futuros (a base de un ingreso anual de dieciséis mil quinientos setenta dólares ($16,570) y una expectativa de vida profesional de veintiocho (28) años), y cuatro mil ochocientos doce dólares con doce centavos ($4,812.12) por la pérdida del automóvil.

En nuestra jurisdicción rige el principio de "causalidad adecuada", según el cual para haber responsabilidad civil, la ocurrencia del daño en cuestión debe ser previsible dentro del curso normal de los acontecimientos y según las circunstancias particulares del caso. *Elba A.B.M. v. U.P.R.*, supra. "Un elemento esencial de la responsabilidad por culpa o negligencia es el factor de previsibilidad y el riesgo envuelto en el caso específico. El grado de previsibilidad requerido en cada caso en particular, depende del estándar de conducta aplicable. El deber de cuidado incluye, tanto la obligación de anticipar, como la de evitar la ocurrencia de daños, cuya probabilidad es razonablemente previsible. Pero la regla de anticipar el riesgo no se limita a que el riesgo preciso o las consecuencias exactas arrostradas debieron ser previstas. Lo esencial es que se tenga el deber de preveer en forma general consecuencias de determinada clase." (Citas omitidas.) *Elba A.B.M. v. U.P.R.*, supra, pág. 309. "Lo determinante es si era de esperarse la ocurrencia del daño." *Torres Maldonado v. J.C. Penney Co.*, 130 D.P.R. 546 (1992).

Al examinar los autos del caso con detenimiento, así como la transcripción de la evidencia desfilada ante el tribunal de instancia, no albergamos dudas sobre la procedencia de la reclamación instada por el recurrido. Éste presentó prueba suficiente sobre la peligrosidad de las condiciones creadas por la combinación entre la falta de avisos y vallas de seguridad y la ausencia de iluminación en el área. Demostró a satisfacción del tribunal el conocimiento de tales condiciones de peligrosidad por parte de los recurrentes, el Municipio y la A.E.E. En cuanto a estos últimos, se desfiló prueba en torno a las llamadas frecuentes realizadas por los vecinos, en ocasiones más de una vez por semana, solicitando la reparación del alumbrado en el lugar; además de la admisión por parte de la A.E.E. —en su contestación a un interrogatorio— respecto a que era su responsabilidad reparar los focos si eran reportados como

dañados. Finalmente, se aportó prueba sobre la ocurrencia de un accidente similar anteriormente en el mismo lugar.

Confrontados con los autos y con la transcripción de evidencia, los hechos relatados por los recurrentes a base de los cuales argumentan sus señalamientos de error, carecen totalmente de apoyo en la prueba. Éstos se basan en imprecisiones y en sus propias conjeturas sin base en la prueba desfilada y admitida como evidencia.[9] El recurrido sustentó sus alegaciones con pruebas sólidas y robustas, consistentes en la prueba documental, en la demostrativa y en el testimonio de los vecinos que le socorrieron, así como su propio testimonio. Reiteradamente, hemos establecido que no intervendremos con la apreciación de la prueba hecha por el tribunal sentenciador, en ausencia de error manifiesto, pasión, prejuicio o parcialidad. *Benítez Guzmán v. García Merced,* 126 D.P.R. 302 (1990); *Cárdenas Maxán v. Rodríguez Rodríguez,* 125 D.P.R. 702 (1990); *Pérez Cruz v. Hosp. La Concepción,* 115 D.P.R. 721 (1984).; *Sánchez Rodríguez v. López Jiménez,* 116 D.P.R. 172 (1985).

En cuanto a la prueba pericial sobre la reconstrucción del accidente, ésta nos parece convincente, satisfactoria y suficiente en derecho, en apoyo a las alegaciones del recurrido. Nuestra evaluación, independiente de la prueba pericial, coincide con la del tribunal a quo. *Ríos Ruiz v. Mark,* 119 D.P.R. 816 (1987); *Cruz v. Centro Médico de P.R.,* 113 D.P.R. 719 (1983); *Velázquez v. Ponce Asphalt,* 113 D.P.R. 39 (1982).

---

[9] En particular, los recurrentes sostienen que el tribunal debió adjudicar la negligencia comparada al recurrido porque surge del informe policíaco que no tenía los cinturones puestos, y que de un informe de sala de emergencias surge que tenía aliento a alcohol. Obvian, sin embargo, la amplia prueba desfilada en torno a que el recurrido fue sacado del auto una vez se había trasladado a la parte trasera y que todos los testigos señalaron que éste no tenía ningún olor a alcohol. Los recurrentes no trajeron prueba testifical alguna para sustentar la veracidad de tales anotaciones en los informes señalados. Véase el esc. 4 de nuestra sentencia.

Incurre la A.E.E., además, en la reprochable práctica de citar sentencias de este Tribunal Supremo no publicadas. Regla 44(c), 4 L.P.R.A Ap. I-A.

## III

Los daños reales y efectivos a la persona o a la propiedad de la parte perjudicada son compensables. El propósito de la concesión de daños no es penalizar el acto negligente, sino compensar al perjudicado. Por tal razón, corresponde a este último establecer la realidad del daño sufrido. H. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. II, pág. 429.

Fundamentadas como estuvieron las determinaciones sobre los daños sufridos por el recurrido en la prueba pericial y documental ofrecida por éste, estamos en igual posición que el foro de instancia para evaluarla y llegar a nuestras propias conclusiones. *Ríos Ruiz v. Mark*, supra, pág. 820.

El recurrido sostuvo sus alegaciones de daños mediante la presentación de una extensa prueba pericial consistente en el testimonio del fisiatra asesor de la A.C.A.A., doctor Sáez (T.E., págs. 164–176); el perito especialista en neuropsicología, doctor Montijo (íd., págs. 246–297), y el perito psiquiatra, doctor Llona (íd., págs. 297–353). Tales testimonios, no controvertidos por los recurrentes, comprueban la realidad de los daños reclamados por el recurrido. No erró el tribunal de instancia al concluir que, como resultado de *este* accidente, el recurrido sufrió daños físicos consistentes en traumas múltiples en su cuerpo, especialmente en la cabeza, cuello, hombros, espalda y abdomen, por los cuales padece una condición de miositis cervical paravertebral permanente, la cual le producirá fuertes dolores de hombro y de cabeza por el resto de su vida, creándole una condición incapacitante.

Además, ha sufrido un daño orgánico cerebral consistente en la muerte de neuronas y conexiones intercelulares no regenerativas de carácter permanente, las cuales le producen un desorden afectivo cerebral que requerirá un ex-

tenso tratamiento psiquiátrico; además de haberle creado un impedimento severo en su funcionamiento social y ocupacional, afectándole funciones cerebrales de juicio, criterio, imaginación, memoria corta y capacidad de lectura, las cuales equivalen a una pérdida de alrededor de diecinueve (19) puntos en su cociente de inteligencia. Esta condición le incapacita para ejercer su profesión de abogado y notario, así como para otras que demanden requerimientos intelectuales elevados.

Tales dolencias le produjeron graves daños y angustias mentales y morales en términos de dolores físicos y otros desórdenes afectivos, así como de considerarse incapaz para el ejercicio de su profesión. Además, generaron un lucro cesante al no poderse desempeñar como abogado durante una vida profesional útil estimada en veintiocho (28) años.

La compensación estimada por el tribunal por los daños sufridos y probados por el recurrido no nos parece irrazonable. Confirmamos sus determinaciones al respecto.

## IV

Reiteradamente, hemos señalado que los honorarios de abogado y los intereses por temeridad sólo proceden cuando la parte perdidosa efectivamente ha incurrido en temeridad, y que la determinación sobre tal comportamiento descansa en la sana discresión del tribunal de instancia; por lo cual este Foro no revisará dicha determinación en ausencia de abuso de discresión por parte del tribunal sentenciador. *Asociación de Condóminos v. Trelles Reyes*, 120 D.P.R. 574 (1988); *Fernández v. San Juan Cement Co., Inc.*, 118 D.P.R. 713 (1987); *Montañez Cruz v. Metropolitan Cons. Corp.*, 87 D.P.R. 38, 40 (1962); *Elba A.B.M. v. U.P.R.*, supra; *Corpak, Art Printing v. Ramallo Brothers*, 125 D.P.R. 724 (1990).

Examinados los autos del caso, concluimos que el foro de

instancia se extralimitó en su discresión al imputarle temeridad a la recurrente, A.E.E. Su conducta al defenderse en este pleito no evidencia contumacia, obstinación e insistencia en una actitud frívola o desprovista de fundamento que obligan a otra parte a asumir y sufrir las molestias, gastos, trabajo e inconveniencias de un litigio innecesario. Véase *Corpak Art Printing v. Ramallo Brothers*, supra, y casos allí citados.

Por otro lado, resulta claramente improcedente en derecho la imposición de honorarios de abogado e intereses por temeridad contra el Municipio codemandado, a la luz de las disposiciones de la Regla 44.3(b) de Procedimiento Civil, 32 L.P.R.A. Ap. III, y de nuestros pronunciamientos en *Colondres Vélez v. Bayrón Vélez*, 114 D.P.R. 833, 843 (1983). Véase, además, *Rodríguez Cruz v. Padilla Ayala*, 125 D.P.R. 486 (1990).

En consecuencia, *se revoca la parte de la sentencia que impuso intereses y honorarios de abogado a los recurrentes. Así modificada, se confirma.*

Lo pronuncia y manda el Tribunal y certifica el señor Secretario General. El Juez Presidente Señor Andréu García está conforme con la parte de la sentencia que estima que los recurrentes Municipio de Caguas y A.E.E. incurrieron en responsabilidad solidaria ante el recurrido, pero disiente de aquella parte que concluye que el recurrido no incurrió en negligencia concurrente, pues las circunstancias presentes en este caso demuestran que éste contribuyó con su propia negligencia a los daños por él sufridos en un grado no menor de un setenta por ciento (70%). El Juez Asociado Señor Negrón García emitió una opinión disidente. El Juez Asociado Señor Fuster Berlingeri no intervino.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

## – O –

Opinión disidente del Juez Asociado Señor Negrón García.

## I

El 8 de octubre de 1986 José Rodríguez Roldán —abogado de cuarenta (40) años, soltero, residente y con oficinas en Caguas— trabajó hasta las 5:00 P.M. y se marchó a su hogar en el Bo. San Salvador. Más tarde regresó a Caguas para ir al cine. Al finalizar la función, entre 10:30 y 11:00 P.M., volvió a su hogar. T.E., pág. 127. Esa noche, cerca de la 1:30 de la mañana —amanecer de 9 de octubre— decidió ir a buscar a Inguermar Collazo y encargarle unas gestiones para un caso civil. Íd., págs. 88 y 129. Collazo, quien era emplazador y mecánico de automóviles, vivía en la calle Kent, urb. Villa Del Rey, primera Sección, en Caguas. Esta fue la primera vez que Rodríguez Roldán iba a visitarlo a esas horas de la madrugada; Collazo lo ignoraba. Íd., págs. 129–132.

La urbanización Villa Del Rey tiene aproximadamente veinte (20) años de establecida. Rodríguez Roldán había estado en ella "en varias ocasiones", tanto de día como de noche. T.E., pág. 128. En la misma esquina cercana donde ocurrió su accidente, residían unas amigas y clientes.

Cuando llegó a Villa del Rey —aproximadamente a las 2:00 A.M.— no había tránsito alguno en la calle que utilizaba. Conducía un Oldsmobile, modelo de 1985, con los focos de luz delanteros encendidos susceptibles —los de mayor intensidad— para alumbrar un mínimo de quinientos (500) pies, y los de menor alcance, ciento cincuenta (150) a doscientos (200) pies. T.E., pág. 208.

Entró a la calle Windsor. Aunque Rodríguez Roldán tenía que virar a la izquierda en la esquina de la calle Luxemburgo, no lo hizo. Continuó despacio, a quince (15) m.p.h., siguió en línea recta; no se percató de que la calle

terminaba en un corte abrupto, sin rótulo, vallas o señal, y cayó violentamente en una quebrada.

## II

¿A qué se debió la falta de percepción y conducta un tanto extraña e inexplicable del licenciado Rodríguez Roldán? La prueba nos lo revela. Auxiliado por unos vecinos, fue trasladado en una ambulancia al hospital y atendido en la Sala de Emergencias. En el informe médico se hizo constar que tenía aliento a alcohol (*ETHO breathe*).([1]) Si bien Rodríguez Roldán negó inicialmente haber tenido en el pasado problemas con el alcohol, la evidencia reveló lo contrario. T.E., pág. 132. A través de un informe que tuvo

---

([1]) "LCDO. GONZALO BARRERAS VARONA:

"P. Doctor, entonces, usted me dice que esta abreviación que hay aquí es: ETHO, significa...?

"R.    Lo he visto utilizado, lo he visto utilizado en salas de emergencia y en otros documentos médicos como 'ethanol'. La abreviatura del etílico, el compuesto éste del alcohol. Etanol, producto del deshecho del metabolismo del alcohol.

"P.    *O sea, que esta persona cuando llega a la Sala de Emergencia tenía aliento a licor.*

"R.    *Eso es lo que dice, eso es lo que yo entiendo de esto aquí, sí, señor.*

"P.    No tengo ninguna otra pregunta.

"LCDO. MANUEL GARCIA TAMAYO:

"P. Este, tengo una pregunta.

"Ese ETH, ¿qué es lo que significa, doctor?

"R.    Yo creo, como le dije al licenciado, que se usa frecuentemente en Sala de Emergencia para un olor en el aliento, que huela a alcohol o a productos de deshechos de alcohol. *Puede ser de otras cosas.*

"P.    O es, o un producto ... o sea ...

"R.    Del metabolismo, del alcohol.

"P.    Del alcohol. ¿Puede ser también que a una persona le hayan limpiado, le hayan lavado unas heridas con alcohol y entonces, venga y presente ese olor?

"R.    Pues, *yo supongo que sí.* Puede ser también diabético y oler también así.

"LCDO. GONZALO BARRERAS VARONA:

"P. Su Señoría, pero lo que pasa es que dice: aliento al alcohol, no olor a alcohol. Son dos cosas totalmente distintas. Doctor, dice: 'aliento a alcohol' ¿verdad? 'Breath'.

"R.    *'Breath' sí.*

"P.    O sea, no es que huela a alcohol la persona porque se le haya puesto alcohol en la cabeza o lo que fuera, ¿correcto?

"R.    *Yo lo que digo es lo que dice ahí.*

"P.    *Aliento a alcohol, es lo que quiere decir, ¿verdad?*

"R.    *'Breath, ethanol breath'.*" (Énfasis suplido.) T.E., págs. 351–353.

ante sí el psicólogo Jorge A. Montijo, éste consignó al entrevistarlo que "[t]iene historial de abuso de alcohol pero indica que actualmente controla su consumo". T.E., pág. 133.

Por otro lado, no obstante haber el policía investigador anotado en su Informe de Accidente (estipulado, T.E., pág. 8), que al momento de ocurrir no usaba los cinturones de seguridad, Rodríguez Roldán también lo negó. Elaboró en su abono la teoría peregrina de que ello se debió a que los policías tenían instrucciones de hacerlo constar así, si no veían a la persona utilizándolo. Íd., págs. 141–142.

### III

Estos hechos demuestran dramáticamente que estamos ante un caso de negligencia comparada. Ciertamente, que el Municipio de Caguas no cumplió con su deber de rotular adecuadamente la calle Windsor y la Autoridad de Energía Eléctrica falló al no reparar a tiempo el alumbrado público. Ahora bien, el testimonio errático de Rodríguez Roldán puso en entredicho su propia versión y credibilidad.

Resulta difícil entender su comportamiento y forma de conducir esa noche. ¿Cómo un abogado, en su sano juicio, sale imprudentemente de su hogar a la 1:30 A.M. para buscar a un mecánico-emplazador? No hay pruebas de que esa gestión fuera, profesionalmente hablando, urgente o no pudiera esperar hasta el día siguiente. ¿Cómo, si viajaba despacio, a 15 m.p.h., por una calle recta y con las luces delanteras de su vehículo encendidas, no pudo ver la esquina de la calle Luxemburgo por la cual tenía que doblar? ¿Cómo continuó por la calle Windsor sin percatarse que poco después terminaba en una quebrada? ¿Cómo pudo negar que admitió ante el psicólogo que había tenido un problema serio de consumo de alcohol? ¿Cómo explicar su negativa de que esa noche no había usado bebidas alcohólicas

(T.E., pág. 132), si dos (2) horas más tarde del accidente todavía tenía aliento a licor y un médico así lo detectó? En resumen, ¿cómo la mayoría puede creerle, sin imponerle responsabilidad por su negligencia comparada?

El *Día de los Inocentes*, ¿es sólo el 28 de diciembre?