SENTENCIA
Se nos solicita la revisión de una sentencia emitida por el Tribunal de Apelaciones, Región Judicial de San Juan, mediante la cual se revocó una resolución emitida por la Junta de Planificación de Puerto Rico, que había aprobado una consulta de ubicación para el proyecto propuesto por los peticionarios. Veamos los hechos acaecidos que originan el recurso.
*864 i-H
En 2001, el Sr. José A. López Pérez (señor López Pérez), por conducto del Sr. Jesús Conde (señor Conde), sometió a la consideración de la Junta de Planificación de Puerto Rico (Junta) la Consulta Núm. 2001-17-0371-JPU para la ubicación de un proyecto residencial multifamiliar en una finca con cabida de 2.3998 cuerdas, que radica en la calle Tulip, Alturas de Borinquen Gardens, en el municipio de San Juan.(1) El 9 de enero de 2002, la Junta emitió una resolución en la que denegó dicha consulta.(2) La Junta determinó que “el proyecto propuesto no cumplía con los Objetivos y Políticas Públicas del Plan de Uso de Terrenos de Puerto Rico ni con la calificación y clasificación del Plan de Ordenación de San Juan”.(3)
El 24 de abril de 2002, el señor López Pérez, por conducto del Sr. Rubén Mercado Brignoni, junto a la parte proponente, sometió ante la consideración de la Junta la consulta Núm. 2002-17-0363-JPU para la ubicación del mismo proyecto que había sido sometido en la Consulta Núm. 2001-17-0371-JPU.(4) Se utilizarían las mismas 2.3998 cuerdas para ubicar un proyecto de desarrollo residencial de setenta apartamentos, distribuidos en cuatro edificios.(5)
El 26 de junio de 2002, la Junta emitió una resolución mediante la cual acordó dejar en suspenso la consulta presentada por la parte proponente hasta tanto dicha parte demostrara la diferencia entre el nuevo proyecto y el previo, ya evaluado y denegado.(6) El 29 de agosto de 2002 la Junta concedió a la parte proponente treinta días adicionales para que sometiera una serie de documentos necesarios *865 para la celebración de una vista pública.(7) Ese mismo día, la Asociación de Vecinos Tulip/Monteverde, Inc. presentó su oposición al proyecto propuesto y solicitó que se le notificara de cualquier trámite de vista o de revisión relacionado con el proyecto. El 30 de octubre de 2002 la Junta declaró “con lugar” la solicitud de intervención de la Asociación de Vecinos de Tulip/Monteverde, Inc.(8)
El 24 de febrero de 2003 se celebró una vista pública en la Junta, presidida por la oficial examinadora, Leda. Vanesa García Quiñones, en la cual las partes interesadas presentaron sus planteamientos en torno al proyecto propuesto.(9)
La Junta permitió que la Sra. Haydee Colón, en representación de la Comisión de Ciudadanos al Rescate de Caimito, Inc. y los vecinos de la urbanización La Campiña pudieran intervenir como partes interesadas en la consulta.(10)
El 15 de diciembre de 2003 la Oficina de Asuntos Legales de la Junta emitió un informe sobre la audiencia pública celebrada el 24 de febrero de 2003. La oficial examinadora concluyó en dicho informe, entre otras cosas, que la “Quebrada Cheo” ubicaba en el terreno del proyecto propuesto inundaba la marginal al fondo de la calle Tulip durante aguaceros fuertes.(11) Sostenido por comentarios emitidos por algunas de las agencias administrativas que evaluaron el proyecto, se expresó lo siguiente.
1. La Autoridad de Energía Eléctrica (A.E.E.) indicó que no tenía objeción en que se aprobara el proyecto. Ex-presó, además, que la parte proponente debía obtener el endoso de la División de Servicios de Riego, Represas y Embalses de la A.E.E.(12)
*866 2. La Autoridad de Acueductos y Alcantarillados (A.A.A.) indicó que no endosaba el proyecto, ya que la parte proponente nunca respondió a una comunicación que se le envió. En esa comunicación se le inquirió a que formara parte de un grupo de empresas que están desarrollando proyectos en la misma área para realizar mejoras al sistema de acueductos del barrio Caimito.(13)
3. La carta del Departamento de Recursos Naturales y Ambientales (D.R.N.A.) evaluó la primera consulta del proyecto. Manifestó que el proyecto debía cumplir con el Reglamento de Planificación Núm. 25 (Reglamento de Siembra, Corte y Forestación de Puerto Rico), Departamento de Recursos Naturales y Ambientales, 24 de noviembre de 1998. Señaló, además, que debido a que el proyecto colindaba con una quebrada, se debía dedicar al uso público una franja de terreno, más una adicional. Se requirió obtener de la Junta de Calidad Ambiental (J.C.A.) el permiso para el control de erosión y sedimentación, y cualquier otro permiso requerido por dicha agencia. Se indicó, además, que una vez tomadas en consideración las recomendaciones antes expuestas, el D.R.N.A. no tenía objeción al desarrollo preliminar del proyecto propuesto.(14)
4. El Instituto de Cultura Puertorriqueña (I.C.P.) ex-hortó a la parte proponente a presentar en la División de Arqueología del I.C.P. una solicitud de evaluación arqueológica y pagar la cuota correspondiente, según el Reglamento para la Radicación y Evaluación Arqueológica de Proyectos de Construcción y Desarrollo.(15)
5. La Autoridad de Carreteras y Transportación (A.C.T.) indicó que el proyecto no se afectaba por las vías propuestas en el Plan Vial de la Región Metropolitana de San Juan. Se le requirió a la parte proponente que consultara al municipio de San Juan con relación a los accesos y *867 las mejoras a las vías municipales. Se le solicitó, además, una aportación conforme a lo dispuesto, según el Reglamento de las Nuevas Competencias para Viabilizar el Desarrollo Urbano (Reglamento de Planificación Núm. 21).(16)
6. El municipio de San Juan indicó que ya había comentado sobre dicho proyecto en la Consulta Núm. 2001-17-0371-JPU.(17)
En su informe, la oficial examinadora determinó que el proyecto cumplió con el requisito del Reglamento de Ordenación Territorial de San Juan,(18) que dispone que los terrenos del proyecto propuesto tengan que estar localizados o colindar con el área desarrollada en el ámbito de la ex-pansión urbana.(19) También se determinó que el proyecto cumplió con todo el trámite administrativo que se desprendía del expediente administrativo.(20) Sin embargo, la oficial examinadora determinó que la topografía del predio era accidentada, por lo que durante la fase de construcción se podía anticipar el movimiento de tierra.(21) Dicha actividad, a su vez, podría ocasionar el arrastre de sedimentación, erosión, generación de polvo, deforestación y problemas de inundaciones en el sector. Indicó, además, que la parte proponente no sometió plan alguno de acción para atender esta posible situación.(22)
Conforme a estos señalamientos, la oficial examinadora concluyó que la parte proponente no pudo demostrar ningún beneficio significativo que brindaría su proyecto al desarrollo del sector o de su infraestructura.(23) Tomando en consideración las determinaciones de hechos y conclusio *868 nes de derecho, no recomendó la aprobación del proyecto.(24)
El 21 de enero de 2004, la Junta refirió el documento de evaluación ambiental, presentado por la parte proponente, a la J.C.A. para su evaluación.(25)
El 20 de febrero de 2004, la J.C.A. notificó mediante carta el cumplimento del proyecto con el Art. 4(c) de la Ley sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1124(c),(26) sujeto a que se acataran ciertas medidas de mitigación y requerimientos de varias agencias.(27)
El 2 de marzo de 2004 la parte proponente sometió a la Junta información adicional con respecto a la infraestructura del proyecto. Acompañó, además, unos planos donde se reducía la cantidad de apartamentos a sesenta y tres y el número de estacionamientos se modificó a setenta.(28)
El 3 de marzo de 2004, la Junta le concedió treinta días a la parte proponente para que sometiera evidencia de que era parte del grupo de empresas que se disponían a realizar proyectos para beneficio de la infraestructura de la A.A.A.(29)
El 15 de marzo de 2004 la parte proponente sometió una comunicación escrita a la A. A. A. relacionada al requisito de pertenecer al combinado de desarrolladores de proyectos para la A.A.A.(30) En ella, la parte proponente informa que el ingeniero de la A.A.A., Ramón Flores, le había indicado que el grupo de empresas ya tenía los proyectos en etapas finales y era difícil entrar en ese momento en éste. También se informó que el ingeniero Flores, en ese momento, solicitó los planos que ilustraran la toma de agua más cer *869 cana al proyecto. Se informó, además, que la consulta del proyecto estaba a la espera del visto bueno de la A.A.A.
El 26 de abril de 2004 la Asociación de Vecinos Tulip/ Monteverde, Inc. sometió a la Junta una segunda oposición al proyecto.(31) Argumentaron, entre otras cosas, que setenta estacionamientos son insuficientes para sesenta y tres apartamentos. Esto, alegadamente, provocaría que se usara la vía pública como estacionamiento y agravaría el ya existente problema de congestión vehicular.
El 17 de mayo de 2004, la Junta ordenó a la parte proponente rediseñar el proyecto de manera tal que cumpliera con los estacionamientos requeridos.(32) En cumplimiento con dicha orden, el 2 de junio de 2004 la parte proponente sometió un nuevo diseño del proyecto con noventa estacionamientos.(33)
El 4 de junio de 2004 la Junta emitió una resolución mediante la cual determinó que era viable el desarrollo de los terrenos para el uso propuesto, por lo que aprobó la consulta para la ubicación del proyecto.(34) Luego de todos los incidentes procesales, la Junta formuló las determinaciones de hechos correspondientes. Determinó que: (1) todas las agencias concernidas le impartieron su aprobación al proyecto; (2) cumplía con los requisitos de zonificación, según el Plan de Ordenación Territorial del Municipio de San Juan; (3) el predio, objeto de la consulta, muestra un comportamiento con marcada tendencia al desarrollo residencial; (4) los desperdicios sólidos serían recogidos por una compañía privada durante la etapa de construcción y el proyecto estaba fuera del área alegadamente inundable. A raíz de esto, la Junta determinó que el proyecto era viable. Sin embargo, emitió una serie de comentarios y recomendaciones que la parte proponente tendría que cumplir para obtener la aprobación del proyecto de construc *870 ción de la Autoridad de Reglamentos y Permisos (A.R.Pe.). Entre ellas señaló que el proyecto tenía que cumplir con los requerimientos de los estacionamientos aplicables, las recomendaciones de la J.C.A. y tomar las medidas necesarias para evitar que los residuos de sustancias orgánicas e inorgánicas tengan acceso a cualquier cuerpo de agua o al sistema pluvial. Además, debe coordinar con la A.A.A. para la conexión del proyecto y cumplir con las recomendaciones y los requisitos de varias agencias. La Junta no adoptó las determinaciones ni las conclusiones que formuló la oficial examinadora en su informe.
Inconformes, el 8 de julio de 2004 la Asociación de Vecinos Tulip/Monteverde, Inc. presentó un escrito de reconsideración ante la Junta.(35) En éste, los vecinos le advirtieron a la Junta sobre la imposibilidad de que el proyecto pudiera ser construido en el terreno propuesto. Alegaron, entre otras cosas, que se presentaron planos incorrectos y que existía una discrepancia en la ubicación de la quebrada y la franja de diez metros requerida. Señalaron que se había encontrado la omisión de una servidumbre de cables eléctricos, además de problemas de estacionamiento y otras discrepancias contenidas en la autorización de la Junta.
El 14 de julio de 2004 la Junta determinó acoger la solicitud de reconsideración presentada por los vecinos.(36) El 23 de agosto de 2004 la parte proponente presentó una oposición a la solicitud de reconsideración.(37) En ella argumentó, entre otras cosas, que muchas de las preocupaciones de los vecinos habían sido atendidas, razón por la cual la Junta aprobó el proyecto; a su vez, se dejaría un área entre la quebrada y la construcción, y se levantaría un muro de contención para evitar el desprendimiento de tierra. En esta oposición añadió que se realizarían estudios técnicos para probar la estabilidad del suelo, por lo que se *871 había rediseñado el proyecto para atemperarlo a las condiciones del sector. Finalmente, todos los vecinos del proyecto habían sido notificados como se exigía.
El 4 de octubre de 2004 la Leda. Aida Silver Cintrón, de la Oficina de Asuntos Legales de la Junta, emitió una opinión legal en torno a la moción de reconsideración.(38) Recomendó que la unidad técnica de la agencia reexaminara los planteamientos de densidad y que se asegurara del cumplimiento con lo aprobado. Recomendó, además, celebrar una inspección ocular del predio para aclarar los planteamientos de los vecinos y de la parte proponente.
El 8 de octubre de 2004 la Junta determinó prorrogar el término para resolver las solicitudes de reconsideración acogidas y mantener en suspenso la consulta hasta tanto la parte proponente se expresara sobre las preocupaciones de los vecinos. Además, se ordenó la celebración de una vista ocular a la cual debían comparecer la Unidad de Hidrología y la Oficina de Asesores Legales de la Junta.(39)
El 25 de octubre de 2004 la parte proponente, en cumplimiento con la orden de 8 de octubre de 2004, se expresó en torno a las preocupaciones de los vecinos.(40)
La vista ocular se realizó en los predios en cuestión el 21 de octubre de 2004. El 27 de octubre de 2004 se redactó el Acta de Inspección Ocular(Acta) y se presentó ante la Junta el 9 de noviembre de 2004.(41)
El 10 de noviembre de 2004 la Junta dictó una resolución mediante la cual denegó las solicitudes de reconsideración presentadas por los opositores al proyecto y se reafirmó en la aprobación de la consultad.(42)
Ante la determinación desfavorable, los vecinos acudieron al Tribunal de Apelaciones mediante un recurso de *872 revisión.(43) El 27 de enero de 2005, notificada el 7 de febrero de 2005, el foro intermedio apelativo emitió una sentencia, revocando la resolución de la Junta que autorizó el proyecto. Determinó que, a base de la prueba presentada, no procedía autorizar la consulta. En esencia, adoptó los datos recogidos en el informe de 15 de diciembre de 2003 de la oficial examinadora de la Junta. Sostuvo que la A.A.A. no había endosado el proyecto, ya que no se contaba con la infraestructura necesaria, ni se modificó el proyecto para cumplir con el requisito de crear una franja de amortiguamiento de diez metros entre la quebrada y éste. No se explicó la razón para descartar el informe de la oficial examinadora, en violación al debido proceso de ley. Además, el tribunal intermedio expuso que la parte proponente del proyecto no formó parte del combinado de empresas y desarrolladores de la A.A.A.; además, que el proyecto propuesto se aprobó en documentos relacionados a la primera consulta que fue denegada. Manifestó que la Junta abusó de su discreción al aprobar la consulta, ya que sus conclusiones no estaban respaldadas por las determinaciones de hechos, ni sustentadas por los documentos y el informe de la oficial examinadora.
Insatisfecho, el peticionario acude ante nos mediante un recurso de certiorari, alegando la comisión de los errores siguientes:
ERRÓ EL HONORABLE TRIBUNAL, DE APELACIONES AL REVOCAR LA RESOLUCIÓN EMITIDA POR LA JUNTA DE PLANIFICACIÓN EL 4 DE JUNIO DE 2004.
ERRÓ EL TRIBUNAL DE APELACIONES AL CONCLUIR QUE EL DICTAMEN DE LA JUNTA DE PLANIFICACIÓN NO SE APOYÓ EN LA TOTALIDAD DEL EXPEDIENTE.
ERRÓ EL TRIBUNAL DE APELACIONES AL DETERMI-NAR QUE LAS CONCLUSIONES DE LA JUNTA DE PLANI-FICACIÓN NO ESTÁN RESPALDADAS POR LAS DETERMINACIONES DE HECHOS, COMO TAMPOCO ESTÁN SUSTENTADAS POR LOS DOCUMENTOS. Escrito de certiorari, págs. 7-8.
*873 Con el beneficio de la comparecencia de las partes, estamos en posición de resolver los asuntos traídos ante nuestra consideración. Veamos.
HH 1—I
A. La revisión judicial de las decisiones administrativas tiene como fin primordial limitar la discreción de las agencias y asegurar que éstas desempeñen sus funciones conforme a la ley.(44) Al evaluar la decisión de una agencia, el tribunal debe determinar si ésta actuó arbitraria o ilegalmente, o de forma tan irrazonable que sus actuaciones constituyeron un abuso de discreción.(45) El criterio rector será la razonabilidad de la agencia recurrida. Así, pues, al realizar su función revisora el tribunal está obligado a tomar en cuenta la especialización y experiencia de la agencia sobre las cuestiones que tuviera ante sí.(46) Al evaluar los casos, es necesario distinguir entre las cuestiones de interpretación estatutaria, en las que los tribunales son especialistas, y las cuestiones propias para la discreción o pericia administrativa.(47) No prevalecerá la interpretación que haga una agencia de la ley a la cual está llamada a poner en vigor, si dicha interpretación es contraria al propósito del estatuto.(48)
La revisión de las determinaciones de hechos está limitada por lo establecido en la See. 4.5 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico (L.P.A.U.), que dispone lo siguiente:(49)

*874
2175. Revisión-Alcance

El Tribunal podrá conceder el remedio apropiado si determina que el peticionario tiene derecho a un remedio.
Las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo. (Énfasis suplido.)
Siempre y cuando estén sustentadas por evidencia sustancíale(50) que obre en el expediente administrativo, las determinaciones de hechos formuladas por la agencia serán sostenidas.(51) Esto es así, porque las decisiones de las agencias administrativas tienen a su favor una presunción de legalidad y corrección. Ésta debe ser respetada por los tribunales mientras la parte que la impugna no produzca suficiente evidencia como para derrotarla.(52) No obstante, las conclusiones de derecho son revisables en todos sus aspectos.(53)
Esto no significa, sin embargo, que al ejercer su función revisora, el tribunal pueda descartar libremente las conclusiones e interpretaciones de la agencia, sustituyendo el criterio de ésta por el propio. Al contrario, hemos reiterado consistentemente —antes y después de la vigencia de la L.P.A.U.— que, de ordinario, los tribunales deben deferencia a las interpretaciones y conclusiones de los organismos administrativos.(54)

Si de la totalidad del expediente administrativo se sostienen las determinaciones adoptadas por el foro administrativo, los tribunales no deben sustituirlas por su propio criterio.

(55)

*875 El proceso de revision judicial comprende tres áreas: (1) la concesión del remedio apropiado; (2) la revisión de las determinaciones de hecho conforme al criterio de evidencia sustancial, y (3) la revisión de las conclusiones de derecho.(56) El expediente administrativo constituirá la base exclusiva para la acción de la agencia en un procedimiento adjudicativo y para la revisión judicial ulterior.(57)
Finalmente, sobre este tema, el foro judicial podrá sustituir el criterio de la agencia por el propio sólo en aquellas ocasiones en que no encuentre una base racional que fundamente la actuación administrativa.(58) “No obstante, es axioma judicial que, ante la prueba pericial y documental, el tribunal revisor se encuentra en igual posición que el foro recurrido y, por lo tanto, está facultado para apreciar la prueba apoyándose en su propio criterio.”(59)
B. La Ley Orgánica de la Junta de Planificación de Puerto Rico autoriza a la Junta a hacer determinaciones sobre los usos de terrenos dentro de los límites territoriales de Puerto Rico.(60) En áreas zonificadas, la consulta de ubicación es el procedimiento mediante el cual la Junta pasa juicio sobre los propuestos usos de terrenos que no son permitidos ministerialmente por la reglamentación aplicable, pero que las disposiciones reglamentarias proveen para que se consideren.(61) La consulta de ubicación es pública o privada, dependiendo de quién la origina. Ésta incluye los proyectos de desarrollo extensos que han de considerarse según las disposiciones reglamentarias vigentes.(62)
*876 Al estudiar, tramitar y resolver una consulta de ubicación, la Junta tomará en consideración los documentos siguientes: la Ley Orgánica de la Junta de Planificación de Puerto Rico;(63) la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991;(64) los planes regionales adoptados por la Junta; los objetivos y las políticas del Plan de Usos de Terrenos de Puerto Rico; los mapas de zonificación y de zonas susceptibles a inundaciones; los planes de usos de terrenos; los planes de ordenación territorial; los usos existentes en el sector; la situación de la infraestructura física y social en el lugar; la distancia entre los terrenos y las áreas construidas, y la importancia agrícola o ambiental de los terrenos; los rasgos topográficos; la densidad poblacional, y otras condiciones sociales, económicas y físicas análogas, entre otros.(65)
La Sec. 7.01 del Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento Núm. 6031 del Departamento de Estado, 12 de noviembre de 1999, pág. 27, dispone lo siguiente:
La aprobación de una consulta pública no implica, en forma alguna, la aprobación del proyecto de transacción o de construcción en sí, el cual deberá regirse por lo establecido en este Reglamento y por cualquier Resolución de la Junta, eximiendo de la presentación a tal proyecto de transacción o de construcción. No obstante, lo anterior, la Junta podrá autorizar conjuntamente con la consulta de ubicación para el uso de terrenos, la transacción correspondiente a solicitud de agencia proponente o podrá delegar en la ARPE la transacción conjuntamente con las etapas posteriores en la ARPE.(66)
C. La Junta puede ordenar la celebración de vistas administrativas a iniciativa propia o a petición de partes, o
*877 vistas públicas en cualquier caso que entienda que merece seguir ese procedimiento, cuando así lo establezca la reglamentación o legislación vigente.(67)
Sin embargo, las agencias, como la Junta, no están obligadas a adoptar las conclusiones y recomendaciones de sus oficiales examinadores.(68) La función de un oficial examinador consiste en celebrar una vista pública a la cual comparecen las partes y, una vez terminada la prueba, rendir un informe detallado a la agencia, expresándole su recomendación.(69) La agencia tiene la facultad estatutaria para dictaminar sobre las cuestiones en controversia a base de su propia consideración del expediente.(70) El informe del oficial examinador no pasa de ser una mera recomendación, que la agencia, según la ley que la creó y con su propio reglamento, tiene discreción para alterar.(71) Esto no quiere decir que las conclusiones del oficial examinador no merecen consideración en la revisión judicial. Esto es así, ya que dichas conclusiones forman parte del expediente administrativo. Además, cuando el informe del oficial examinador es contrario e incompatible con el de la agencia, particularmente en cuestiones que dependen del contacto inmediato con la prueba, la función revisora de los tribunales debe tornarse más rigurosa.(72)
HH HH hH
Con el trasfondo normativo antes expuesto, pasamos a resolver si erró el Tribunal de Apelaciones al revocar la resolución de la Junta aprobando el proyecto propuesto.
En su sentencia, el foro intermedio apelativo señaló que la resolución de la Junta de 4 de junio de 2004, mediante la *878 cual se aprobó el proyecto propuesto, descartó las recomendaciones de la oficial examinadora de 15 de diciembre de 2003 sin detallar las razones para tal curso de acción. Diferimos. Veamos.
En la resolución de la Junta de 4 de junio de 2004, ésta expuso un resumen de los hechos del caso, sus propias determinaciones de hechos y sus conclusiones de derecho. Entre sus determinaciones de hechos, la Junta determinó que el proyecto ubicaría en un terreno con cabida de 2.3998 cuerdas, que el área aledaña al predio objeto de consulta muestra una marcada tendencia al desarrollo residencial y que los terrenos bajo consulta están en el área de expansión urbana del municipio de San Juan. Tuvo en cuenta en estas determinaciones que el terreno está clasificado como suelo urbano y calificado en un distrito de ordenación residencial uno (R-l) y que el acceso vehicular sería a través de la calle Tulip. Asimismo, determinó que los desperdicios sólidos serían recogidos por una compañía privada durante la etapa de construcción, que el cuerpo de agua conocido como “Quebrada Cheo” ubica en el fondo del terreno del proyecto propuesto, que varias agencias sometieron sus comentarios al proyecto, que la topografía del terreno es accidentada y que el proyecto propuesto ubicaría en el lote del terreno que contiene una franja estrecha con el mismo nivel de la calle. La Junta incluyó también que el desarrollo propuesto tendría un costo aproximado de $2,450,000, lo que generaría aproximadamente cien empleos en la etapa de construcción y unos diez en la etapa operacional, que el predio ubica fuera del área inundable y que la J.C.A. certificó el cumplimiento con la Ley sobre Política Pública Ambiental.
En sus conclusiones, la Junta determinó, entre otras cosas, que el proyecto estaba en armonía con varias metas y objetivos del Plan de Usos del Terreno de la Región Metropolitana de San Juan, y que se encontraba en una posición céntrica dentro de un área de pleno desarrollo. Además, planteó que el proyecto contaba con la infraestructura necesaria para obtener el acceso a la carretera y obtener los *879 servicios de energía eléctrica. Así también, que éste cumplía con la densidad poblacional establecida por el Plan de Ordenación Territorial y que le fue enviada la notificación a los dueños de terrenos colindantes.
La Junta acordó, entre otras cosas, que A.R.Pe. determinaría cuál sería la próxima etapa en el trámite del proyecto. Estableció que, previo a comenzar con la construcción, se debía obtener de la J.C.A. los permisos para el polvo fugitivo, el permiso para realizar una actividad generante de desperdicios sólidos y permiso para el control de erosión y prevención de sedimentación. Acordó, además, que se deberían tomar las medidas necesarias para evitar que sustancias orgánicas e inorgánicas ganaran acceso a cualquier cuerpo de agua o sistema pluvial; además, cumplir con el Reglamento de Siembra, Corte y Forestación para Puerto Rico,(73) coordinar con la A.A.A. para la conexión del proyecto y seguir las recomendaciones del D.R.N.A. contenidas en su carta de 26 de junio de 2001. El almacenaje, el manejo y la disposición de los desperdicios sólidos se deberán realizar según la reglamentación vigente y se debe cumplir con disposiciones reglamentarias de la Junta, el Reglamento de Ordenamiento Territorial de San Juan(74) y la Ley de Reciclaje.(75)
Las conclusiones y determinaciones de hechos a las que llegó la Junta en su resolución final son completas, detalladas y minuciosas. Sostener que la Junta descartó las recomendaciones de la oficial examinadora sin fundamento para hacerlo es incorrecto. La Junta emitió una resolución final de trece páginas, en la que detalló el porqué aprobó el proyecto propuesto. Aunque fueron descartadas, entendemos que las recomendaciones de la oficial examinadora fueron consideradas por la Junta durante la preparación de la resolución final. El hecho de que la resolución final de *880 la Junta hizo referenda a señalamientos específicos del informe de la oficial examinadora es evidencia, de por sí, de que se tomó en consideración del informe de ésta al momento de emitir la resolución final. Además, no podemos olvidar que el informe de la oficial examinadora no pasa de ser una mera recomendación. La Junta tiene discreción de alterar o hasta ignorar este informe. La Junta no está obligada a adoptar las conclusiones y recomendaciones de sus oficiales examinadores,(76)
Repasemos algunas divergencias específicas entre el informe de la oficial examinadora y la resolución de la Junta.
El informe de la oficial examinadora indicó que el proyecto propuesto no contaba con la infraestructura necesaria, ya que en la carta de 14 de febrero de 2003 la A.A.A. indicó que no endosaba el proyecto. La Junta reconoció en su resolución la ausencia del endoso de la A.A.A. La parte proponente explicó que cuando se le solicitó que se uniera al Combinado de Desarrolladores de la A.A.A. ya era muy tarde. Sostuvo que era difícil unirse al grupo por la etapa en que se encontraba el desarrollo de los proyectos. Es evidente que la Junta aceptó esta explicación y aprobó la consulta. Incluso, en la resolución final, la Junta ordenó a la parte proponente que, previo al inicio de su construcción, realizara la coordinación correspondiente con la A.A.A. para la conexión del proyecto propuesto.
El informe de la oficial examinadora indicó, además, que la calle Tulip es utilizada como acceso por al menos cuatro desarrollos, por lo que el proyecto agravaría el alegado problema de congestión vehicular ya existente. En su resolución final, la Junta tomó en consideración esta recomendación, pero sostuvo que la Autoridad de Carreteras y Transportación de Puerto Rico no tenía objeción al proyecto propuesto y que la calle Tulip tenía el acceso controlado. La Junta tomó estos hechos en consideración al aprobar la consulta.
*881 El informe de la oficial examinadora señaló, además, que el área confronta un problema de inundación al final de la calle Tulip. Sin embargo, después de tomar en consideración el señalamiento de la oficial examinadora, la Junta sostuvo que el predio del proyecto propuesto estaba ubicado fuera del área inundable.
Este informe también señaló que la construcción del proyecto podría ocasionar el arrastre de sedimentación, erosión y generación de polvo fugitivo, causando mayores problemas de inundación. Después de tomar en consideración este señalamiento de la oficial examinadora, la Junta emitió una serie de instrucciones a la proponente que tendría que seguir y permisos que tenía que obtener para atemperar esta situación.
Luego de exponer todas sus conclusiones de hecho y conclusiones de derecho, la Junta llegó a la determinación de aprobar la consulta. Es menester señalar que, después de la aprobación del proyecto, la Junta acogió unas mociones de reconsideración de los opositores del proyecto, las cuales atendió y denegó. Por las razones descritas entendemos que la Junta no actuó de forma arbitraria o irrazonable.
Por otro lado, el foro intermedio apelativo señala que, con posterioridad al informe emitido por la oficial examinadora, el 15 de diciembre 2003, la parte promovente sometió un documento de evaluación ambiental a la J.C.A. acompañado de los documentos correspondientes al primer proyecto, Consulta Núm. 2001—17-0371-JPU, que fue denegado el 9 de enero de 2002 y notificado el 20 de febrero de 2002. Primero, tenemos que señalar que el lugar de ubicación del proyecto inicial y el actual es exactamente el mismo lugar. La única diferencia estriba en un rediseño conceptual donde se reduce el número de apartamentos. Segundo, en el expediente del caso de marras aparecen cartas de varias agencias, con fecha posterior a febrero 2002, en las que se deniega la primera consulta, que se refieren al proyecto actual, donde manifiestan no tener objeción alguna al proyecto. Ejemplo de esto son: el municipio *882 de San Juan,(77) D.R.N.A.,(78) I.C.P,(79) A.E.E.(80) y la Autoridad de Desperdicios Sólidos.(81) La Junta, al tomar su determinación, contó con el beneficio de los comentarios y las recomendaciones de las agencias gubernamentales pertinentes. Todos esos endosos, comentarios y recomendaciones eran favorables a la aprobación de la consulta.
En conclusión, entendemos que el Tribunal de Apelaciones erró al revocar la resolución de la Junta. La Junta fundamentó su determinación en la totalidad de la evidencia que obra en el expediente. La Junta tomó en consideración las distintas recomendaciones de las agencias consultadas. Las inquietudes señaladas en el informe de la oficial examinadora fueron consideradas por la Junta. Las conclusiones de la Junta están sustentadas por los documentos y el informe de la oficial examinadora. Al sustituir su criterio por el de la Junta, el foro intermedio apelativo obvió el conocimiento técnico y especializado que dicha agencia tiene sobre el uso de terrenos en Puerto Rico. Por ello, resulta forzoso concluir que la Junta no abusó de su discreción al aprobar la consulta, ya que su dictamen se apoyó en la totalidad del expediente.
Concluimos que los errores señalados fueron cometidos por el Tribunal de Apelaciones.
IV
Por los fundamentos antes expuestos, revocamos la sentencia emitida por el Tribunal de Apelaciones y devolvemos el caso a la Junta de Planificación para que continúen los procedimientos en conformidad con lo aquí resuelto.
Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada Señora Fiol Matta disin *883 tió con una opinión escrita. El Juez Asociado Señor Fuster Berlingeri no intervino.
(Fdo.) Aida Ileana Oquendo Graulau

Secretaria del Tribunal Supremo

 Apéndice del Escrito de certiorari, págs. 147-148.

 íd.

 íd., pág. 147.

 íd., págs. 149-158.

 íd.

 íd., pág. 158.

 íd., págs. 164-165.

 íd., págs. 167-168.

 íd., pág. 169.

 íd., págs. 171-175.

 íd., págs. 176-188.

 íd., pág. 394.

5) íd., págs. 189-190.

 íd., págs. 225-226.

 íd., pág. 191.

 íd., pág. 182.

 íd.

 Reglamento de Ordenación Territorial de San Juan, vigente el 28 de marzo de 2003.

 Apéndice del Escrito de certiorari, págs. 184-185.

 íd., pág. 185.

 íd., pág. 186.

 íd.

 íd.

 íd., pág. 187.

 íd., págs. 192-239.

 Ley Núm. 9 de 18 de junio de 1980, según enmendada, 12 L.P.R.A. sec. 1121 et seq. (ed. 1997).

 Apéndice del Escrito de certiorari, págs. 31-32.

 íd., págs. 243-268.

 íd., págs. 241-242.

 íd., págs. 269-270.

 íd., págs. 272-274.

 íd., págs. 292-294.

 íd., págs. 295-297.

 íd., págs. 298-311.

 íd., págs. 321-333.

 íd, pág. 334.

 íd, págs. 340-343.

 íd., págs. 351-353.

 íd., págs. 47-48 y 356-358.

 íd., págs. 359-363.

 íd., págs. 373-379.

 íd., págs. 398-401.

 íd., págs. 112-397.

 Torres v. Junta Ingenieros, 161 D.P.R. 696 (2004); Miranda v. C.E.E., 141 D.P.R. 775, 786 (1996).

6) Torres v. Junta Ingenieros, supra; Franco v. Depto. de Educación, 148 D.P.R. 703, 710 (1988).

 Rebollo v. Yiyi Motors, 161 D.P.R. 69 (2004).

 Adorno Quiles v. Hernández, 126 D.P.R. 191, 195 (1990); Rebollo v. Yiyi Motors, supra.

 Mun. de San Juan v. J.C.A., 149 D.P.R. 263, 279-280 (1999).

 Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico (L.P.A.U.), Ley Núm. 170 de 12 de agosto de 1988, según enmendada, 3 L.P.R.A. sec. 2101 et sea.

 “Evidencia sustancial” es aquella relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión. Rebollo v. Yiyi Motors, supra, págs. 76-77. Véase Misión Ind. P.R. v. J.P., 146 D.P.R. 64 (1998).

 Torres v. Junta Ingenieros, supra; O.E.G. v. Rodríguez, 159 D.P.R. 98 (2003); Rivera Concepción v. A.R.Pe., 152 D.P.R. 116, 121 (2001).

 Henríquez v. Consejo Educación Superior, 120 D.P.R. 194, 210 (1987); M. & B.S., Inc. v. Depto. de Agricultura, 118 D.P.R. 319 (1987).

 Torres v. Junta Ingenieros, supra; O.E.G. v. Román, 159 D.P.R. 401 (2003).

 Rebollo v. Yiyi Motors, supra, pág. 77.

 íd.

 Torres v. Junta Ingenieros, supra; Mun. de San Juan v. J.C.A., supra.

 Mun. de San Juan v. J.C.A., supra.

 Rebollo v. Yiyi Motors, supra.

 íd., pág. 78.

 Ley Orgánica de la Junta de Planificación, Ley Núm. 76 de 24 de junio de 1975 (23 L.P.R.A. sec. 22 et seq.).

 Dye-Tex de P.R., Inc. v. Royal Ins. Co. P.R., 150 D.P.R. 658 (2000); Rodríguez Roldán v. Mun. de Caguas et al., 133 D.P.R. 694 (1993); Hernández, Álvarez v. Centro Unido, 168 D.P.R. 592 (2006).

 Sec. 2.00 del Reglamento de Zonificación de Puerto Rico, Reglamento de Planificación Núm. 4, Reglamento Núm. 6211 del Departamento de Estado, 5 de *876 noviembre de 2000.

 Ley Núm. 75 de 24 de junio de 1975, según enmendada, 23 L.P.R.A. sec. 62 et seq.

 Ley Núm. 81 de 30 de agosto de 1991, según enmendada, 21 L.P.R.A. sec. 4001 et seq.

 Sec. 7.01 de Reglamento de Procedimientos Adjudicativos de la Junta de Planificación, Reglamento Núm. 6031 del Departamento de Estado, efectivo el 12 de noviembre de 1999.

 íd.

 íd.

 Henríquez v. Consejo Educación Superior, supra.

 Rivera v. Junta Rel. Trabajo, 70 D.P.R. 342, 345-346 (1949).

 Henríquez v. Consejo Educación Superior, supra.

 Rivera v. Junta Rel. Trabajo, supra; Hernández García v. J.R.T., 94 D.P.R. 22, 28 (1967).

 íd.; J.R.T. v. Escuela Coop. E.M. de Hostos, 107 D.P.R. 151, 157 (1978).

 Reglamento de Siembra, Corte y Forestación para Puerto Rico, Reglamento Núm. 5922 del Departamento de Estado, 24 de noviembre de 1998.

 Reglamento de Ordenación Territorial de San Juan.

 Ley para la Reducción y Reciclaje de Puerto Rico, Ley Núm. 70 de 18 de septiembre de 1992, según enmendada, 12 L.P.R.A. sec. 1320 et seq.

 Henríquez v. Consejo Educación Superior, supra.

 Apéndice del Escrito de certiorari, págs. 25-31.

 íd., págs. 22-23.

 íd., pág. 20.

 íd., pág. 21.

 íd., págs. 33-35.