EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ivette García Reyes<br><br>Peticionaria<br><br>vs.<br><br>Cruz Auto Corp. Y Scotiabank de Puerto Rico<br><br>Recurridos | Certiorari<br><br>2008 TSPR 92<br><br>174 DPR \_\_\_\_ |

Número del Caso: CC-2006-515

Fecha: 21 de mayo de 2008

Tribunal de Apelaciones:

        Región Judicial de San Juan, Panel I

Juez Ponente:

        Hon. Carlos López Feliciano

Abogado de la Parte Peticionaria:

        Lcdo. Carlos J. Vargas Ferrer

Abogados de la Parte Recurrida:

        Lcdo. Elí Galarza Rivera

Materia: Revisión Administrativa Civil

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ivette García Reyes

      Peticionaria

         v.                  CC-2006-515

Cruz Auto Corp. y Scotiabank de
Puerto Rico

      Recurridos

Opinión del Tribunal emitida por el Juez Asociado señor Rivera Pérez.

San Juan, Puerto Rico, a 21 de mayo de 2008.

Por medio del presente recurso se nos solicita la revisión de una sentencia emitida por el Tribunal de Apelaciones. En la misma se revocó un dictamen del Departamento de Asuntos del Consumidor que decretó la resolución del contrato de compraventa de un vehículo de motor, al determinar la existencia de dolo en el consentimiento.

II

El 28 de septiembre de 2002, la aquí peticionaria, señora Ivette García Reyes, en adelante Sra. García Reyes y/o compradora, adquirió mediante compraventa con Cruz Auto Corporation, en adelante Cruz Auto o la vendedora, un vehículo de motor nuevo, marca Mitsubishi, modelo Nativa del año 2001.

El precio de venta fue de $22,000, el cual se materializó mediante la firma del documento titulado "Descripción de Venta" y del "Contrato de venta al por menor a plazos y pagaré".

En cuanto al pronto pago y balance financiado existen versiones encontradas. Es la contención de la Sra. García Reyes, que al momento de la compraventa, dio un pronto de $ 4,000 en efectivo y que financió los restantes $18,000 a través del Banco Scotiabank de Puerto Rico, en adelante, Scotiabank.[1] Según la versión ofrecida por la compradora, cuando ésta solicitó el correspondiente recibo de pago, Cruz Auto le indicó que no era necesario pues dicha información constaba en el "Contrato de venta al por menor a plazos y pagaré".[2] En adición, realizó un pago en

---

[1] Por una parte la Sra. García Reyes, sostuvo que efectúo un pago de $4,000 dólares en efectivo. En el **"Contrato de compraventa al por menor a plazos"** dicha cantidad aparece en el espacio correspondiente a **pronto en efectivo.** (Apéndice del recurso de *Certiorari*, pág. 633.)
Por otra parte, Cruz Auto sostuvo que la Sra. García Reyes no pagó dicha cantidad y que se le otorgó un crédito de $ 3,900 por razón de las reparaciones efectuadas a la unidad. En la hoja de **"Descripción de venta"** dicha cantidad aparece en el espacio correspondiente a **crédito otorgado**. (Apéndice del Recurso de *Certiorari*, pág.616.)

[2] Testimonio vertido por la Sra. García Reyes durante la vista celebrada en DACO, el 30 de noviembre de 2004. Apéndice del Recurso de *Certiorari*, pág. 633. Véase además, Trascripción del 30 de noviembre de 2004, líneas 10-14.

efectivo de $200 por concepto de la tablilla del vehículo, del cual Cruz Auto expidió un recibo.

Por otro lado, surge del expediente que el señor Iván Casiano, vendedor de Cruz Auto, antes de la venta, le informó a la Sra. García Reyes, que al vehículo se le había reemplazado el guardalodo y el parachoques ("bumper") delantero. Se le explicó además, que el frente del vehículo se había pintado porque estaba rayado. Esta información consta por escrito en el documento de "Descripción de venta" el cual contiene tanto la firma de la Sra. García Reyes como la del vendedor de Cruz Auto, señor Iván Casiano. [3]

Una vez la compradora tomó posesión del vehículo, éste comenzó a confrontar problemas mecánicos. El primer día, mientras la Sra. García Reyes conducía su vehículo se le apagó y un técnico de Cruz Auto tuvo que recogerlo. [4]

Más adelante, la Sra. García Reyes, notó que, mientras conducía el vehículo, este vibraba y se desviaba hacia el

---

[3] Apéndice del Recurso de *Certiorari*, pág. 616.

[4] No surge claramente del expediente el motivo por el cual el vehículo se apagó. La Sra. García Reyes declaró durante su testimonio que no recordaba la causa del éste desperfecto. Sin embargo, el Sr. Iván Casiano, vendedor de Cruz Auto, declaró que creía recordar que se debió a problemas relacionados con la batería o el alternador. Ambos concurrieron en que el vehículo fue reparado en dos días.

lado izquierdo. De esta manera, descubrió la existencia de un descuadre en la parrilla, el foco izquierdo y el parachoques ("bumper") delantero de la unidad. Además, surgieron problemas con los frenos y la necesidad de alineamiento.

Para atender esa situación, se comunicó telefónicamente con Cruz Auto en donde le indicaron que llevara el vehículo al taller de servicios de Cruz Auto ubicado en Humacao. Luego de reiteradas gestiones para que aceptaran el vehículo, pues el taller alegaba estar lleno, el 16 de enero de 2003, se aceptó el vehículo y se inició la reparación.[5]

El 27 de enero de 2003, la compradora se personó a las facilidades de Cruz Auto en Humacao a los fines de obtener información sobre su vehículo y/o recoger el mismo. Mientras esperaba en el taller alguien le comentó que el

_____

[5] Surge de la sentencia emitida por el Tribunal de Apelaciones, que la Sra. García Reyes no recogió su vehículo del taller en el cual se estaba reparando hasta el 3 de febrero de 2005, luego de que DACO emitiera su Resolución en el caso.

Ello a pesar de que el señor Félix D. Ríos, gerente del lote de Humacao, le remitiera dos cartas certificando que la unidad estaba reparada y en perfectas condiciones. (Transcripción del 30 de noviembre de 2004, Apéndice del Recurso de *Certiorari*, págs. 84-86.)

vehículo había sido chocado. Posteriormente, se le entregó una nota que contenía el mensaje siguiente:

Ivette García:

Nativa blanca no está lista, el trabajo es más fuerte de lo esperado, hay que centralizar el compacto.

Lista viernes, Gracias.

Ante esta situación, la Sra. García se molestó y exigió una conversación con personal gerencial de Cruz Auto. En dicha reunión reclamó la cancelación del negocio efectuado y el cambio de la unidad. Además expresó que nunca le informaron que el vehículo tenía problemas con el compacto[6]. El Sr. Iván Casiano, atendió sus reclamaciones y le indicó que no tenía problema alguno en cambiarle la unidad por otra del mismo modelo. No obstante, le hizo saber que en ese caso tenía que pagar el pronto real de $4,000 que se le había rebajado como crédito en la unidad adquirida.

Insatisfecha, la Sra. García Reyes, envió una misiva a Scotiabank, institución bancaria que financió el vehículo, para informarle los problemas que estaba confrontando con

---

[6] El compacto es una pieza ubicada al frente del vehículo la cual está cubierta por el tapalodo y el parachoques ("bumper"). Según la versión ofrecida por el perito de la compradora, para que se afecte el compacto, el golpe ha de ser uno de gran magnitud.

la unidad y las gestiones habidas con Cruz Auto. Indicó además, que el vehículo adolecía de vicios ocultos y ello no se le había notificado al momento de la venta, razón por la cual interesaba cancelar el contrato y la devolución de las prestaciones.

Así las cosas, el 5 de febrero de 2004, la Sra. García Reyes presentó ante DACO, Oficina Regional de Caguas, una querella en contra de Cruz Auto, Mitsubishi Motor Sales of Caribbean y Scotiabank. En la misma alegó que al momento de la compraventa no se le notificaron **todos los daños que adolecía el vehículo**, específicamente el hecho de que éste había recibido un fuerte impacto en la parte delantera cuando se bajaba de la grúa, en las facilidades Mitsubishi Motor Sales. Sostuvo que, de haber conocido este dato, no hubiese hecho la compra del vehículo. Por tal motivo, solicitó la cancelación del contrato y la devolución de su dinero.[7]

El 5 de marzo de 2003, la compradora enmendó la querella para incluir en su reclamación que algunas piezas de su automóvil, el bonete y el guardalodo, no fueron registradas en el Departamento de Transportación y Obras Públicas, en adelante DTOP.

---

[7] Apéndice del Recurso de *Certiorari*, pág. 628.

Cruz Auto contestó la querella negando todas las alegaciones de la compradora y aclaró que, al momento de la compraventa, ésta únicamente ofreció la cantidad de $ 200 para cubrir el costo de la tablilla. Explicó además que, todas las reparaciones efectuadas al vehículo fueron informadas <u>antes de la venta</u> a la Sra. García Reyes y, por ésta razón, se le otorgó un crédito de $3,900 al precio total del vehículo. [8]

---

[8] Testimonio vertido por el señor Ivan Casiano durante el contrainterrogatorio realizado en la vista administrativa:

P. ¿Y ella le preguntó por qué le reemplazaron esas piezas?

R. Yo le expliqué que fue que la unidad tuvo un **leve accidente** bajándola de uno de los "car carriers" y Mitsubishi nos dio un descuento a nosotros y el descuento se da para adelante.

P. Okay, pero si yo voy a comprarle un carro a usted y usted me dice que le reemplazaron x piezas y yo le pregunto qué fue lo que le pasó. ¿Qué palabras usted dijo?. Porque usted a preguntas de ambos compañeros especificó que le informó que había sido rallada bajándola del "car carrier" en la Mitsubishi. ¿Eso fue lo que se le informó?

R. Exacto.

P. ¿Y por qué no lo escribió aquí en este documento?

R. Bueno, si el cliente me lo exige, yo lo escribo. O sea, yo hice la anotación y el

Durante el proceso administrativo se realizaron tres inspecciones técnicas al vehículo: el 26 de febrero de 2003, el 2 de abril de 2003 y el 5 de marzo de 2004. La primera inspección fue realizada por el señor Luis E. Solá Giralt, técnico automotriz enviado por la Oficina Regional de Caguas. Su informe reflejó que, el bonete, el guardalodo y el parachoques ("bumper") de la unidad, habían sido reemplazados; además, indicó que el bonete estaba descuadrado y le faltaban los sujetadores del guardafangos. El inspector hizo constar en la hoja de observaciones que las piezas reemplazadas al vehículo fueron las originales.[9]

El 2 de abril de 2003, se llevó a cabo la segunda inspección realizada por el señor Luis H. Abrahante, técnico de el D.A.C.O. En su informe expresó que, el cubre faltas del lado izquierdo se apreciaba nuevo, a diferencia del bonete el cual aparentaba haber sido reemplazado. Señaló que, las reparaciones realizadas al vehículo fueron unas superficiales, debido a que la magnitud del daño no era uno que precisara de mayores intervenciones. La tercera inspección estuvo a cargo del

_____

cliente me la firmó bajo su conocimiento en todo momento.

[9] Apéndice del Recurso de *Certiorari*, págs.618-621.

señor José Terrón, técnico de el D.A.C.O. En su informe confirmó las observaciones de las inspecciones anteriores e indicó que las piezas reemplazadas tenían el número de serie asignado por el Departamento de Transportación y Obras Publicas.[10]

La Sra. García Reyes, objetó las tres evaluaciones realizadas por los técnicos de  el D.A.C.O. a su vehículo. Alegó, entre otras cosas, que las observaciones realizadas por el señor Carlos J. Rivera Arzuaga, perito contratado por la compradora, no coincidían con las observaciones realizadas por los técnicos de el D.A.C.O. Sostuvo que éstos, no realizaron prueba de carretera al vehículo[11], único modo que, a juicio del perito de la Sra. García Reyes, se podía apreciar el fuerte impacto que había recibido el compacto del vehículo. Cabe señalar que el perito de la Sra. García Reyes, testificó que el examen

---

[10] Sobre este particular cabe señalar que Cruz Auto vendió la unidad sin haber obtenido el correspondiente número de identificación del Departamento de Transportación y Obras Publicas requerido cuando se reemplazan piezas a los vehículos. Posteriormente, Cruz Auto realizó las gestiones requeridas y obtuvo el mismo, seis (6) meses después de efectuada la venta.

[11] Esta alegación fue confrontada durante la vista administrativa. Se evidenció un aumento en el millaje del vehículo luego de las evaluaciones realizadas por los peritos de el D.A.C.O.

del vehículo reflejó serios descuadres productos de un fuerte impacto.

El 30 de septiembre de 2003, Scotiabank anunció su representante legal y el 16 de octubre de 2003, Mitsubishi Motor Sales of Caribean, Inc. contestó su querella.

El 22 de octubre de 2003, la Sra. García Reyes solicitó el traslado de su caso de la Oficina Regional de Caguas de D.A.C.O. a la división de San Juan, petición que fue concedida. En esa misma fecha Scotiabank presentó una moción de desestimación.

Posteriormente, la Sra. García Reyes, solicitó a el D.A.C.O. que ordenara a Mitsubishi Motors someter toda la información que evidenciara el modo en que Cruz Auto había adquirido el vehículo. A base de ésta información, se confirmó que, Cruz Auto compró el vehículo por el precio de $14,500 a Mitsubishi Motors Sale of Caribbean.[12]

---

[12] Al respecto el señor Julio Cruz, empleado y representante de la línea Mitsubishi y Hyundai en Cruz Auto, declaró que lo siguiente:

"Mitsubishi Motors tiene unas unidades, varias unidades al año que tienen unos desperfectos como por ejemplo, rayazos, que hay que ponerles un tapalodo, un bonete, un "bumper" y cogen esas unidades y las llevan a más gente, a los "dealers" de Mitsubishi para vendérnoslas a nosotros, no es una subasta pública como se ha hablado aquí. Eso es una subasta que se le da solamente a los concesionarios de Mitsubishi,

El 2 de septiembre de 2004 se llevó a cabo la reunión entre abogados. En la misma, las partes acordaron relevar a Mitsubishi Motors de la reclamación. Por esta razón, se ordenó el cierre y archivo de la querella en cuanto a éste último.

El 22 de noviembre de 2004, las partes presentaron de manera separada su informe con antelación al juicio. La Sra. García Reyes, alegó que, (1) al momento de la compra, Cruz Auto, de manera intencional, no le notificó que la unidad había sido adquirida mediante subasta pública de Mitsubishi Motor Sales, y que, el vehículo había recibido un fuerte impacto en el frente, (2) que no fue informada del reemplazo del bonete y que a consecuencia del golpe recibido, otras piezas habían sufrido daños considerables, (3) que de habérsele informado debidamente estos daños no hubiese comprado la unidad. Por último adujo en su querella la existencia de dolo grave.

Por su parte, Cruz Auto negó que el vehículo tuviera un defecto en el compacto y alegó que, según los documentos firmados por las partes al momento de la compraventa, se desprendía que la compradora aceptó una reducción al

---

allí no puede ir el que vende Ford, el que vende Mazda, solamente es de nosotros". (Apéndice del recurso de *Certiorari*, Transcripción oral, págs. 150-151).

precio de venta, en consideración a las reparaciones efectuadas al vehículo.

El 30 de noviembre de 2004 se celebró la vista administrativa en la cual testificaron la Sra. García Reyes, el perito de la compradora, señor Carlos J. Rivera Arzuaga, el perito de Cruz Auto, señor Ramón González Gómez, el vendedor de Cruz Auto, señor Iván Casiano Resto, el hojalatero a cargo de la reinstalaciones de la unidad y la reparación del vehículo, señor Héctor Rodríguez, y el señor Julio Cruz, empleado y representante de Mitsubishi en Cruz Auto.

Durante esta vista, el perito de la compradora, declaró que de acuerdo a su experiencia el vehículo había recibido un fuerte impacto por la parte delantera. El perito de Cruz Auto no estuvo de acuerdo en que el vehículo había sufrido un fuerte impacto, pero admitió que en efecto el vehículo fue impactado. Esto también fue confirmado por el testigo, señor Héctor Rodríguez, hojalatero que instaló el bonete nuevo y tapalodos.

El vendedor, señor Iván Casiano, testificó que no le informó a la vendedora que el vehículo había sido impactado, y que sólo le explicó que se había reemplazado el guardalodos y el parachoques ("bumper") delantero por

causa de unos rayazos.[13] Alegó que ésta no cuestionó nada al respecto.

Con estos hechos, el 28 de enero de 2005, el D.A.C.O. emitió su resolución. En la misma, concluyó que Cruz Auto, incumplió con lo dispuesto en el artículo 22.1 del Reglamento Núm. 4797, denominado "Reglamento de garantías de vehículos de motor", en adelante, Reglamento Núm.4797. Dicho artículo impone a todo vendedor de un vehículo de motor nuevo, la obligación de informar por escrito al comprador, previo a la venta, si ha sido objeto de alguna reparación cosmética significativa o mecánica estructural.

Al ocultarle información a la Sra. García Reyes, sobre el impacto recibido por la unidad, incurrió en dolo grave que daba lugar a la resolución del contrato entre las partes. Por tal razón, decretó la nulidad del contrato y ordenó a Cruz Auto y Scotiabank reembolsarle solidariamente a la Sra. García Reyes el pronto y las mensualidades pagadas, luego de lo cual la compradora tendría que devolver el vehículo a la vendedora.

El 15 de febrero de 2005, Cruz Auto y Scotiabank, oportunamente solicitaron reconsideración. En síntesis, alegaron que no era procedente la resolución del contrato

---

[13] Véase, Apéndice del recurso de *Certiorari*, pág. 354, líneas 12-14 de la transcripción del 24 de enero de 2005.

ni la restitución de los $4,000 alegadamente dados como pronto por la Sra. García Reyes. El D.A.C.O. declaró no ha lugar la solicitud. Fundamentó su determinación en que el testimonio de la Sra. García Reyes le mereció entera credibilidad.

Inconforme, Cruz Auto acudió mediante recurso de revisión ante el foro intermedio apelativo. Adujo que la prueba desfilada ante el foro administrativo no fue suficiente para decretar la resolución del contrato de compraventa celebrado por las partes. Asimismo expresó que, el D.A.C.O. erró en la aplicación de la doctrina de saneamiento y resolución del contrato, al no aplicar la Ley Núm.330 de 2 de septiembre de 2000, Ley complementaria de garantías de vehículos de motor[14], y al considerar como vicios ocultos unos daños que sufrió el vehículo dentro del taller de servicios. Scotiabank no recurrió ante el Tribunal de Apelaciones ni se unió al recurso presentado por Cruz Auto.

El foro intermedio apelativo acogió el recurso y concluyó que del documento titulado "Descripción de venta" presentado en evidencia ante el D.A.C.O., se podía constatar que los $3,900 que la Sra. García Reyes alegó

_____
[14] 10 L.P.R.A. sec. 2066 *et seq*.

haber ofrecido como pronto pago, fueron en realidad un descuento o crédito otorgado por Cruz Auto a la compradora.

Expresó que, el documento de "Descripción de venta" contenía la firma de la compradora y en el mismo aparecía la anotación del vendedor siguiente: *"Cliente tiene conocimiento que a la unidad se le reemplazó el guardalodo y bumper delantero y luego se pintó al frente. 9/28/02"*.

Asimismo sostuvo que, el "Contrato de ventas al por menor a plazos y pagaré" no podía considerarse una evidencia de un pronto pago, según expresó el D.A.C.O. en su resolución, ya que éste documento no refleja necesariamente las negociaciones extrínsecas al documento entre el vendedor y el comprador.

En lo que respecta a la resolución del contrato, el foro intermedio apelativo determinó que no procedía la resolución del contrato, decisión emitida por el D.A.C.O., puesto que la compradora tenía conocimiento de los desperfectos de la unidad y los defectos presentes fueron corregidos. Dicho foro expresó en su sentencia que, conforme al artículo 21.3 del Reglamento Núm.4797, *supra*, el vendedor o su representante tiene una oportunidad razonable para reparar los defectos presentes. Si no lo

hace o no puede corregirlos, entonces procede la resolución del contrato de compraventa o reducir proporcionalmente su precio de venta. Por estos fundamentos, el Tribunal de Apelaciones, revocó la resolución emitida por DACO.

De esta determinación, recurre ante nos, la Sra. García Reyes y plantea la comisión de los siguientes errores:

> **Erró el Tribunal de Apelaciones al determinar que la prueba desfilada ante el Departamento de Asuntos del Consumidor no era suficiente para decretar la resolución del contrato, y ordenar la restitución de las prestaciones.**

> **Erró el Tribunal de Apelaciones al sustituir el criterio del Departamento de Asuntos del Consumidor aún cuando existe suficiente evidencia sustancial en el expediente administrativo para sostener las determinaciones de hechos y de derecho formuladas en su resolución.**

> **Erró el Tribunal de Apelaciones al intervenir con la determinación administrativa del Departamento de Asuntos del Consumidor y al no prestarle la debida deferencia.**

### III

En síntesis, el peticionario plantea ante nos que, el Tribunal de Apelaciones, abusó de su discreción al intervenir con las determinaciones de hecho del foro administrativo especializado, sustituyendo arbitrariamente

la apreciación de la prueba por dicho organismo por sus apreciaciones particulares. En vista de ello, examinaremos si la prueba desfilada ante el D.A.C.O. constituyó evidencia sustancial para decretar la resolución del contrato de compraventa efectuado entre la Sra. García Reyes y Cruz Auto.[15] Veamos.

A

El Artículo 1213 de nuestro Código Civil[16], dispone que:

"No hay contrato sino cuando concurren los requisitos siguientes:

1) consentimiento de los contratantes.
2) objeto cierto que sea materia del contrato y,
3) causa de la obligación que se establezca."

Sabido es, que en nuestro ordenamiento jurídico el consentimiento de las partes es uno de los elementos esenciales que debe concurrir para la existencia de todo contrato. El contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras a dar alguna cosa o prestar algún servicio. Ahora bien, dicho consentimiento supone la concurrencia de ciertos

_____

[15] Evidencia sustancial es aquella relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión.

[16] 31 L.P.R.A.sec.3391.

presuestos necesarios para su validez y eficacia, entre ellos, <u>la declaración de la voluntad libre de vicios</u>.

De acuerdo con el Artículo 1217 del Código Civil[17], dicho consentimiento será nulo si éste fuere prestado por error, violencia, intimidación o dolo.[18]  Existe dolo cuando con palabras o maquinaciones insidiosas de parte de uno de los contratantes, es inducido el otro a celebrar un contrato que, sin ellas, no hubiera hecho.[19] Además, constituye dolo el callar sobre una circunstancia importante relacionada con el objeto del contrato.[20]  Sin embargo, no todo tipo de dolo produce la nulidad de un contrato.  A tales efectos, el Art. 1222 del Código Civil, *supra*, dispone que **[p]ara que el dolo produzca la nulidad de los contratos, deberá ser grave y no haber sido empleado por las dos partes contratantes.**[21]  **De tal modo**

---

[17] 31 L.P.R.A.sec. 3404.

[18] Se entiende por dolo como todo un complejo de malas artes, <u>contrario a la honestidad e idóneo para sorprender la buena fe ajena</u>, generalmente para beneficio propio, en que viene a resumirse el estado de ánimo de aquél que no sólo ha querido el acto, sino que además ha previsto y querido las consecuencias antijurídicas de él provenientes. (Énfasis nuestro).Véase, <u>Colón v. Promo Motors Imports, Inc,</u> 144 D.P.R.659 (1997).

[19] Art. 1221 del Código Civil,  31 L.P.R.A. sec. 3408.

[20] <u>Bosques Soto v. Echevarría Vargas</u>, 162 D.P.R.830(2004).

[21] 31 L.P.R.A. sec. 3409.

**que afecta el consentimiento que inspira y persuade al contratante.**[22] Este dolo grave se ha denominado como el dolo causante.[23]

Existe otra especie de dolo, denominado por el Art. 1222 del Código Civil, *supra*, como dolo incidental, cuya existencia no produce la nulidad del contrato. Este tipo de dolo no tiene una influencia decisiva en la esencia de la obligación, sino que facilita la celebración del contrato.[24] En el dolo incidental, contrario a el dolo causante, existe la voluntad de contratar del perjudicado, pero hay engaño en el modo en que se celebra el contrato.

Sin éste, el contrato de todas formas se hubiera celebrado, pero no bajo las mismas condiciones. Cualquier engaño con respecto a dichas condiciones no arranca por sí sólo el consentimiento en la totalidad de la obligación, sino en algún extremo o particularidad de ella.[25] El dolo

---

[22] *Colón v. Promo Motor Imports, Inc.*, 144 D.P.R. 659 (1997).

[23] *Rivera v. Sucn. Díaz Luzunaris*, 70 D.P.R. 181, 185 (1949).

[24] *Colón v. Promo Motor Imports, Inc.*, *supra*.

[25] *Colón v. Promo Motor Imports, Inc.*, *supra*.

incidental sólo obliga al que lo empleó a indemnizar en daños y perjuicios.[26]

En pasadas ocasiones hemos expresado que en la determinación de si existe dolo que anula el consentimiento, se debe considerar, entre otras cosas, la preparación académica del perjudicado, así como su condición social y económica, y las relaciones y el tipo de negocios en que se ocupa.[27] Puede ser que en un caso, el dolo no surja de un simple hecho, sino del conjunto y la evolución de circunstancias y manejos engañosos.[28]

Finalmente, el dolo, al igual que el fraude, no se presume; pero ello no significa necesariamente que tenga que probarse directamente. Puede establecerse mediante inferencia o por evidencia circunstancial.[29]

Una vez decretada la nulidad de una obligación, los contratantes deben restituirse recíprocamente las cosas

---

[26] 31 L.P.R.A. sec. 3409.

[27] Citibank v. Dependable Ins. Co., Inc., 121 D.P.R. 503, 519 (1988).

[28] Acosta & Rodas, Inc. v. PRAICO, 112 D.P.R. 583, 616 (1982).

[29] Miranda Soto v. Mena Eró, 109 D.P.R. 473, 478 (1980); Mayagüez Corp. v. Betancourt, 156 D.P.R. 234 ( 2002).

que hubiesen sido materia del contrato, con sus frutos y el precio con sus intereses.[30]

## B

En virtud de la Ley de Garantías de vehículos de Motor[31], el D.A.C.O. aprobó el Reglamento Núm.4797 de 30 de septiembre de 1992, conocido como Reglamento de Garantías de vehículos de motor, en adelante, Reglamento Núm. 4797. El objetivo de este reglamento es proteger adecuadamente a los consumidores en Puerto Rico en la adquisición de vehículos de motor, asegurarles que estos vehículos sirvan el propósito para el cual fueron adquiridos, y que reúnan las condiciones necesarias para garantizar al comprador la protección de la vida y propiedad.[32] Por ende, el mismo se debe interpretar liberalmente a favor del consumidor.[33]

Dicho reglamento es aplicable a toda persona natural o jurídica que se dedique por sí misma, o por mediación de su representante o agente, o como, agente o representante

---

[30] 31 L.P.R.A. sec 3514.

[31] Ley Núm.7 de 24 de septiembre de 1979, 10 L.P.R.A. sec.2051 *et seq.*

[32] Artículo 2, Reglamento Núm.4797, *supra.*

[33] Artículo 4, Reglamento Núm.4797, *supra.*

del fabricante o como intermediario de otra persona, a la venta de vehículos de motor nuevos o usados en Puerto Rico.[34]

El Reglamento Núm.4797,*supra*, dispone en su Artículo 22.1 lo siguiente:

> "Todo vendedor de un vehículo de motor nuevo **notificará al comprador por escrito**, si previo a la venta de dicho vehículo, éste ha sido objeto de alguna **reparación cosmética sustantiva o mecánica estructural.**" (Énfasis nuestro).

También, dicho reglamento, en su Artículo 34, advierte que:

> "Nada de lo dispuesto en este Reglamento limitará en forma alguna el derecho del consumidor a **ejercer cualquier acción que le reconozcan las leyes generales o especiales del E.L.A., así como las acciones de saneamiento por evicción, saneamiento por vicios ocultos y la acción redhibitoria que reconoce el Código Civil de Puerto Rico.**" (Énfasis nuestro)

Se desprende por tanto que, las determinaciones de el D.A.C.O. relacionadas a estos asuntos deben ser cónsonas con los artículos del Código Civil sobre las acciones de saneamiento en la compraventa.[35]

---

[34] Artículo 3, Reglamento Núm.4797, *supra*.
[35] <u>Domínguez v. Caguas Expressway Motors</u>, 148 D.P.R. 387(1999).

En lo que respecta a la acción de saneamiento por vicios ocultos, entre las obligaciones que le impone nuestro Código Civil, *supra*, a un vendedor, se encuentra la responsabilidad de éste ante los vicios o defectos ocultos que tuviere la cosa vendida. Esta obligación se denomina saneamiento por vicios o defectos ocultos.[36] Estos vicios pueden ser de índole jurídico, en cuyo caso consistirían en una limitación al derecho transmitido o pueden ser de hecho, como cuando se trata de defectos intrínsecos de la cosa vendida.[37] A los vicios ocultos se les denomina redhibitorios, ya que pueden deshacer la venta.[38]

En torno a la acción redhibitoria por vicios ocultos en la cosa vendida, el Artículo 1373 del Código Civil[39], *supra*, dispone lo siguiente:

> " El vendedor estará obligado al saneamiento por los defectos ocultos que tuviere la cosa vendida, si la **hacen impropia para el uso a que se la destina, o si disminuyen de tal modo este uso que, de haberlos conocido el comprador, no la habría adquirido o habría dado menos precio por ella**; pero no será responsable de los

---

[36] Artículo 1363, Código Civil, 31 L.P.R.A. sec. 3801.

[37] Ferrer v. General Motors Corp., 100 D.P.R. 246, 255 (1971).

[38] *Íd.*

[39] 31 L.P.R.A. sec.3841.

> defectos manifiestos o que estuvieren a la
> vista, ni tampoco de los que no lo estén,
> si el comprador es un perito que, por razón
> de su oficio o profesión debía fácilmente
> reconocerlos." (Énfasis nuestro).

El Artículo 1374 del Código Civil, *supra*,[40] dispone lo

siguiente:

> "El vendedor responde al comprador del
> saneamiento por los vicios o defectos
> ocultos en la cosa vendida aunque los
> ignorase. Esta disposición no regirá cuando
> se haya estipulado lo contrario, y el
> vendedor ignorara los vicios o defectos
> ocultos de lo vendido".

Siendo el propósito o causa de la venta para el

comprador adquirir la cosa, el servirse de ella, dicho

propósito dejaría de realizarse si una vez entregada la

cosa, se ve privado de la cosa o imposibilitado de

aplicarla a los usos que le son propios.[41]

Por tanto, conforme a las disposiciones de nuestro

Código Civil, *supra*, el comprador podrá optar entre

desistir del contrato, abonándosele los gastos que pagó,

denominándose tal acción como redhibitoria[42] o podrá

rebajar una cantidad proporcional del precio,

---

[40] 31 L.P.R.A. sec. 3842.

[41] Ferrer v. General Motors Corp., *supra.*

[42] La acción redhibitoria representa la restitución *"in integrum",* ya que coloca las partes en la misma condición en la que se hallaban antes de la compraventa.

denominándose tal acción como *quanta minoris*[43]. En adición, si el vendedor conocía los vicios o defectos ocultos de la cosa vendida y no los manifestó al comprador,se le indemnizará de los daños y perjuicios, si optare por la rescisión.[44]

Para que proceda una acción de saneamiento por vicios ocultos han de coincidir los siguientes requisitos: (1) <u>no deben ser conocidos por el adquirente</u>; (2) <u>el defecto debe ser grave o suficientemente importante para hacer la cosa impropia para el uso a que se le destina o que disminuya de tal modo este uso que, de haberlo conocido el comprador, no la habría comprado o habría dado menos precio por ella</u>;(3) <u>que sea preexistente a la venta</u> y (4) <u>que se ejercite la acción en el plazo legal, que es el de seis(6) meses contados desde la entrega de la cosa vendida.</u>

Cónsono con lo anterior, en <u>Ford Motor Co. v. Benet</u>,[45] sostuvimos lo siguiente:

> "Para llevar a cabo la acción redhibitoria por vicios ocultos en autos defectuosos, la

---

[43] La acción *quanti minoris*, conlleva la restitución del precio percibido en proporción a la pérdida de valor de la cosa, a consecuencia del defecto

[44] 31 L.P.R.A. sec. 3843.
[45] 106 D.P.R. 232,238 (1977).

> jurisprudencia ha establecido que solamente
> compete al comprador probar que el automóvil
> que compró no funcionaba en forma normal y
> que el vendedor tuvo oportunidad de corregir
> los defectos y no pudo o no los corrigió."

Para establecer qué son vicios redhibitorios, hemos adoptado el criterio de "aquellos defectos que exceden de las imperfecciones menores que cabe esperar normalmente en un producto determinado, no siendo necesario que dichos defectos imposibiliten el uso de la cosa vendida, siempre que mermen notablemente su valor".[46]

Sobre este particular, reiteramos el criterio generalmente aceptado por la doctrina de que, <u>la apreciación de la importancia del defecto, a los fines de resolver la procedencia de la acción redhibitoria, es esencialmente una cuestión de hecho, justificándose, por lo tanto, nuestra intervención con la discreción del juzgador, sólo en aquellos casos que acusen ausencia de prueba adecuada o comisión de error manifiesto en su apreciación.</u>[47]

C

---

[46] <u>García Viera v. Ciudad Chevrolet Inc.</u>, 110 D.P.R. 158,162 (1980); <u>D.A.C.O. v. Marcelino Mercury, Inc.</u>, 105 D.P.R.80, 84 (1976).
[47] *Íd.*

La revisión judicial de las decisiones administrativas tiene como fin primordial limitar la discreción de las agencias y asegurarse que éstas desempeñen sus funciones conformes a la ley.[48] Debido a que las decisiones administrativas tienen a su favor la presunción de legalidad y corrección,[49] reiteradamente hemos sostenido que las conclusiones e interpretaciones de los organismos administrativos especializados merecen gran consideración y respeto.[50] Por esta razón, debemos ser bien cautelosos al intervenir con dichas determinaciones.[51]

Al evaluar la decisión de una agencia, el tribunal debe determinar si ésta actuó arbitraria, ilegal o de forma irrazonable constituyendo sus actuaciones un abuso de discreción.[52] El criterio rector será la razonabilidad de la agencia recurrida. Así pues, al realizar su función

---

[48] Torres v. Junta Ingenieros, 161 D.P.R. 696 (2004); Miranda v. C.E.E., 141 D.P.R. 775,786 (1996).

[49] Íd.

[50] Murphy Bernabé v. Tribunal Superior, 103 D.P.R. 692,699 (1975); Mun. de San Juan v. J.C.A., 152 D.P.R. 673,688 (2000).

[51] Metropolitan S.E. v. A.R.P.E., 138 D.P.R. 200, 213, (1995); Fuertes y otros v. A.R.P.E., 134 D.P.R. 947 (1993); Viajes Gallardo v. Clavell, 131 D.P.R. 275 (1992).

[52] Torres v. Junta de Ingenieros, supra, Franco v. Depto. de Educación, 148 D.P.R. 703, 710(1988).

revisora el tribunal está obligado a tener en cuenta la especialización y experiencia de la agencia sobre las cuestiones que tuviera ante sí.[53] Esta labor revisoria exige distinguir entre cuestiones de interpretación estatutaria, en la que los tribunales son especialistas, y cuestiones propias para la discreción o pericia administrativa.[54]

Cuando una agencia interpreta el estatuto, que viene llamado a poner en vigor de forma tal que produce resultados contrarios al propósito de esa ley, dicha interpretación no prevalece.[55]

La revisión de las determinaciones de hechos está limitada por lo establecido en la sección 4.5 de la Ley de Procedimientos Administrativos Uniforme, en adelante, L.P.A.U., que dispone lo siguiente[56]:

2175. Alcance

---

[53] Rebollo v. Yiyi Motors, 161 D.P.R. 69 (2004).

[54] Adorno Quiles v. Hernández, 126 D.P.R. 191, 195 (1990); Rebollo v. Yiyi Motors, *supra*.

[55] Mun. de San Juan v. J.C.A., 149 D.P.R.263, 279-280 (1999).

[56] Ley de Procedimiento Administrativo Uniforme, Ley Núm.170 del 12 de agosto de 1988, según enmendada, 3 L.P.R.A. secs.2101 *et seq.*

"El Tribunal podrá conceder el remedio apropiado si determina que el peticionario tiene derecho a un remedio.
Las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo."

Siempre y cuando estén sustentadas por evidencia sustancial que obre en el record administrativo, las determinaciones de hechos formuladas por la agencia serán sostenidas.[57] Esto es así, porque las decisiones de las agencias administrativas tienen a su favor una presunción de legalidad y corrección, la cual debe ser respetada por los tribunales mientras la parte que la impugna no produzca suficiente evidencia como para derrotarla.[58]

De ordinario, los tribunales no intervendrán en las determinaciones de hechos de las agencias, si existe evidencia sustancial en apoyo de las mismas.[59] La norma de evidencia sustancial, aplicable a las determinaciones de

---

[57] Torres v. Junta de Ingenieros, *supra*, O.E.G. v. Rodríguez, 159 D.P.R. 98 (2003), Rivera Concepción v. A.R.P.E., 152 D.P.R. 116, 121.

[58] Henríquez v. Consejo de Educación Superior, 120 D.P.R. 194, 210 (1987), M.& B.S.,Inc. v. Depto. De Agricultura, 118 D.P.R. 319 (1987).

[59] Pacheco v. Estancias, 160 D.P.R. 409, 432-433 (2003).

hecho, persigue evitar la sustitución del criterio del tribunal revisor.[60]

Para que un tribunal pueda decidir que la evidencia sustancial en el expediente administrativo no es sustancial, es necesario que la parte afectada demuestre que existe otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia.[61]

En Bermúdez <u>Cintrón v. Registrador</u>[62], sostuvimos lo siguiente:

> "Cuando se trata, por último de organismos administrativo, como D.A.C.O., a los que se ha facultado para adjudicar querellas, la revisión judicial debe ser especialmente rigurosa para servir de contrapeso a la amplitud de la discreción administrativa."

No obstante, las conclusiones de derecho son revisables en todos sus aspectos.[63] Esto no significa, sin embargo, que al ejercer su función revisora el tribunal pueda descartar libremente las conclusiones e interpretaciones de la agencia, sustituyendo el criterio de ésta por el

---

[60] <u>Reyes Salcedo v. Policía de P.R.</u>, 143 D.P.R. 85, 95 (1997).

[61] <u>Metropolitana S.E. v. A.R.P.E.</u>, *supra*.

[62] 111 D.P.R. 708, 712-713 (1981).

[63] <u>Torres v. Junta de Ingenieros</u>, *supra*, <u>O.E.G. v. Rodríguez</u>, 159 D.P.R. 98 (2003).

propio. Al contrario hemos reiterado consistentemente antes y después de la vigencia de la L.P.A.U que, de ordinario, los tribunales deben deferencia a las interpretaciones y conclusiones de los organismos administrativos.[64] Si de la totalidad del récord administrativo se sostienen las determinaciones adoptadas por el foro administrativo, los tribunales no deben sustituirlas por su propio criterio.[65]

El proceso de revisión judicial comprende tres (3) áreas: (1) la concesión del remedio, (2) la revisión de las determinaciones de hecho conforme al criterio de evidencia sustancial; y (3) la revisión de las conclusiones de derecho.[66] El récord administrativo constituirá la base exclusiva para la acción de la agencia en un procedimiento adjudicativo y para la revisión judicial ulterior.[67]

Finalmente, sobre éste tema, el foro judicial podrá sustituir el criterio de la agencia por el propio sólo en aquellas ocasiones que no encuentre una base racional que

---

[64] Rebollo v. Yiyi Motors, *supra*.
[65] *Íd.*

[66] Torres v. Junta de Ingenieros, *supra*, Mun. de San Juan v. J.C.A, *supra*.

[67] Mun. de San Juan v. J.C.A., *supra*.

fundamente la actuación administrativa.[68]  No obstante, es axioma judicial que ante la prueba pericial y documental, el tribunal revisor se encuentra en igual posición que el foro recurrido y por tanto, está facultado para apreciar la prueba apoyándose en su propio criterio.[69]

IV

Teniendo en cuenta los principios reseñados, debemos resolver si erró el Tribunal de Apelaciones al revocar la determinación del D.A.C.O. ordenando la resolución del contrato de compraventa.  Conforme a la decisión emitida por el D.A.C.O, la prueba desfilada demostró que el consentimiento de la compradora estuvo viciado por la actuación dolosa de Cruz Auto al ocultar que el vehículo había recibido un fuerte impacto por su parte delantera previo a la venta.

En su sentencia el foro apelativo expresó que no procedía la resolución del contrato, ya que la Sra. García Reyes tenía conocimiento de los desperfectos y éstos

_____

[68] Rebollo v. Yiyi Motors, *supra*.

[69] *Íd*, véase además, Dye Tex P.R. Inc. v. Royal Ins. Co. P.R., 150 D.P.R. 658 (2000); Rodríguez Roldán v. Mun. de Caguas,et al 133 D.P.R. 694 (1993).

fueron reparados.   El fundamento de ésta conclusión fue únicamente que la "Hoja de descripción de venta" contenía la anotación siguiente: *"Cliente tiene conocimiento que la unidad se le reemplazó guardalodo y bumper delantero y luego se pintó el frente por unos rayasos"*.   Diferimos.

El D.A.C.O. celebró vista evidenciaria, en la cual las partes desfilaron prueba. En su Resolución, formuló sus determinaciones de hechos y conclusiones de derecho las cuales fueron específicas y basadas en la evidencia que surge del expediente.

Fue un hecho probado que Cruz Auto adquirió el vehículo a un precio menor, mediante compra a Mitsubishi Motors Sale. En la misma, se venden aquellas unidades que aunque nuevas, han sufrido ciertos desperfectos.   Por ende, es razonable concluir que Cruz Auto conocía que el frente del vehículo había recibido un fuerte impacto al caerse del *"car carrier"*.   Debido a éste accidente, Cruz Auto tuvo que reemplazarle al vehículo el guardalodo, el parachoques delantero (*"bumper"*), el bonete y los bujes de la barra estabilizadora.

Como bien expresó el D.A.C.O. en su Resolución, el Artículo 22.1 del Reglamento Núm. 4797, *supra*, le impone a todo vendedor la obligación de notificar por escrito al

comprador, previo a la venta, si el vehículo ha sido objeto de alguna **reparación cosmética significativa o mecánica estructural**. Si un vendedor incumple la disposición reglamentaria antes citada, el consentimiento otorgado en un contrato de compraventa sería nulo.

En sus conclusiones de derecho el D.A.C.O. determinó que, conforme a dicha reglamentación, Cruz Auto estaba obligado a informarle a la Sra. García Reyes, que las reparaciones efectuadas al vehículo se debían a que la unidad que deseaba adquirir había recibido un impacto en su parte delantera. De la "Hoja de descripción de venta" se desprende que tal circunstancia fue omitida. En adición, el vendedor admitió en su declaración que no le informó a la compradora que el vehículo había sido impactado, ni el cambio del bonete.

El lenguaje utilizado por Cruz Auto no fue uno claro, ni especifica por escrito, que el vehículo fue impactado. Dicha anotación sólo alude a unos rayazos. El no ofrecerle la información correcta a la Sra. García Reyes, impidió que tuviese un conocimiento completo de todos los elementos relacionados con la unidad que adquiría y, de este modo le privó de emitir un consentimiento informado.

Tampoco Cruz Auto evidenció que informó verbalmente a la compradora de las referidas circunstancias.

La Sra. García Reyes demostró con su testimonio que actuó conforme a la creencia de que las reparaciones fueron por causa de unos rayazos y no producto de unos golpes significativos. El D.A.C.O. determinó correctamente que, si al momento de la compraventa, la Sra. García Reyes, hubiese tenido la información correcta con respecto al vehículo no lo hubiese adquirido.

El accidente del vehículo era un <u>elemento esencial</u> que ésta hubiese tomado en consideración al momento de contratar, de haberlo conocido. Ciertamente, la parte vendedora actuó de manera dolosa al ocultar esta información y vició el consentimiento de la compradora.

Por otro lado, una vez la Sra. García Reyes adquirió el vehículo, éste comenzó a presentar una serie de desperfectos. Conforme a las reparaciones mecánicas que obran en el expediente, y las determinaciones de hechos formuladas por el D.A.C.O., el bonete y el parachoques estaban descuadrados, le faltaban los sujetadores del guardafangos, presentaba una vibración irregular y problemas de alineamiento. Desde el primer momento, el

vehículo se le apagó en ocasiones y presentó además problemas en los frenos.

Finalmente, según consta por la nota que se le entregó en el taller, la reparación que el vehículo requería era una mayor a la realizada, puesto que el compacto del vehículo estaba afectado como consecuencia del fuerte impacto recibido. La Sra. García Reyes nunca tuvo conocimiento de éste daño.

En ocasiones anteriores hemos tenido oportunidad de expresarnos en torno a los vicios ocultos cuando el objeto de compraventa es un vehículo de motor. Sabemos que la reparación sustantiva o magnitud del defecto oculto, es una cualidad relativa, ya que no se trata de que el defecto quede oculto en sentido literal, sino que lo sea para el comprador atendiendo sus características individuales.[70] Esto significa que no será responsable el vendedor por vicios ocultos, cuando el comprador sea un perito que debiera fácilmente conocer los defectos por razón de su ocupación u oficio.[71]

Tras analizar los informes del personal especializado y la evidencia que consta en el expediente, quedó demostrado

---

[70] J.M. Manresa y Navarro, Comentarios al Código Civil español, Tomo 10, Vol.1, Reus S.A. Madrid, 1969, pág. 338.

[71] Íd.

que, verificada la entrega, Cruz Auto no cumplió con su deber de garantizar la plena posesión de la cosa vendida. El vehículo en cuestión tenía unos vicios ocultos que hicieron el objeto de la venta impropio para su uso, de forma tal que de haberlos conocido la compradora no lo hubiese adquirido. Cruz Auto no llevó a cabo una reparación adecuada del vehículo previo a la venta. El daño recibido en su parte delantera y los problemas presentados en el compacto mermaron notablemente el valor de la unidad, y fueron ocultados.

Como hemos expresado anteriormente, a los fines de resolver la procedencia de una acción redhibitoria, la apreciación de la importancia de los defectos, es una cuestión de hechos en la cual el foro administrativo, en este caso, está en mejor posición que el foro apelativo.

Al quedar evidenciada la existencia de vicios ocultos, a la Sra. García Reyes le asiste una acción redhibitoria al amparo del Código Civil, *supra,* y que a su vez está sostenida en el Artículo 35 del Reglamento Núm. 4797, *supra*. La determinación del D.A.C.O. al ordenar la resolución del contrato de compraventa fue una dentro de sus prerrogativas administrativas.

Por tal razón, entendemos que la credibilidad otorgada a los testigos merece nuestra deferencia y que el remedio concedido por la agencia fue uno adecuado. En adición, Cruz Auto no aportó evidencia ante el Tribunal de Apelaciones que derrotara la presunción de corrección que caracteriza la decisión del foro administrativo.

Erró el foro apelativo intermedio al intervenir con la determinación administrativa.


IV

Por los fundamentos antes expuestos procede la revocación de la sentencia del Tribunal de Apelaciones y la reinstalación de la resolución de D.A.C.O.


Efraín E. Rivera Pérez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ivette García Reyes

     Peticionaria

        v.

                            CC-2006-515

Cruz Auto Corp. y Scotiabank de
Puerto Rico

     Peticionario

SENTENCIA

San Juan, Puerto Rico, a 21 de mayo de 2008.

Por los fundamentos antes expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, revocamos la sentencia del Tribunal de Apelaciones y ordenamos la reinstalación de la resolución de D.A.C.O.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez concurre sin opinión escrita. La Jueza Asociada señora Fiol Matta no intervino.

                       Aida Ileana Oquendo Graulau
                       Secretaria del Tribunal Supremo